FILED

2026 Mar-23  PM 12:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

RIHANNA POINTER, GRANT STURDIVANT, TIMONI TAITE, JALEEL MATANMI, JERMAINE BALL, SARA BETH CADDELL, GABRIELLE GUNTER, and EMMY WAUGH

    *Plaintiffs*,

vs.

SCOTT PHELPS in his official capacity as President Pro Tempore University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, ANGUS R. COOPER III, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARABARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDINO, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, KENNETH VANDERVOORT AND KAY IVEY, in their official capacities as members of the University of Alabama Board of Trustees

    *Defendants*.

Case No.:

## COMPLAINT

1.    Plaintiffs Rihanna Pointer, Grant Sturdivant, Timoni Taite, Jaleel Matanmi, Jermaine Ball, Sara Beth Caddell, Gabrielle Gunter, and Emmy Waugh (collectively "Plaintiffs"), by their undersigned counsel, bring this action against the following members of the Board of Trustees for the University of Alabama System, in their official capacities: Scott Phelps, Mike Brock, Karen Brooks, Myla E. Calhoun, Angus R. Cooper III, Ronald Gray, Jeff Gronberg, O.B.

1

Grayson Hall, Jr., Barbara Humphrey, W. Davis Malone III, Evelyn Vansant Mauldin, Harris Morrissette, Kenneth Simon, Kenneth Vandervoort, and Kay Ivey (collectively, "Defendants").

2. Plaintiffs are students at The University of Alabama in Tuscaloosa, Alabama ("UA" or "University") and served or planned to serve as editors and/or contributors, both present and future, to two student-operated magazines, *Alice* and *Nineteen Fifty-Six*. These student magazines—unlike other student publications at the University—were suspended and defunded by UA because UA administrators disfavor their editorial perspectives related to race and gender. Defendants' suspension of *Alice* and *Nineteen Fifty-Six*, constitutes unlawful censorship of Plaintiffs' viewpoints in violation of their rights under the First Amendment to the United States Constitution.

### PRELIMINARY STATEMENT

3. In 2015, after a collaborative meeting between faculty and staff at UA, UA students launched *Alice*, a magazine "to help students learn how to feel comfortable in their journey of navigating college life during this transition from teen to adult years." The magazine was named *Alice* because of a desire to ensure that student life at the university was not only about "Big Al," the university's mascot. Alice publishes an award-winning, biannual print issue that features photography, articles, and other media on a variety of topics related to women, gender, and sexuality from the perspective of the magazine's student editors and contributors.

4. Five years later, in 2020, Tionna Taite founded the magazine *Nineteen Fifty-Six* with the support of several UA faculty and staff. *Nineteen Fifty-Six*, named in honor of Autherine Lucy Foster registering as UA's first Black student in 1956,[1] is a "student-run magazine focused

---

[1] The University of Alabama, History, Desegregation, https://www.ua.edu/about/history/desegregation/ (last visited Mar. 16, 2026).

on Black culture, Black excellence, and Black student experiences at The University of Alabama."[2] *Nineteen Fifty-Six* publishes a biannual print issue every academic year that features award-winning journalism, photography, and design—along with online content— from the perspective of the magazine's student editors and contributors.

5.      On December 1, 2025, contributors and editors of both *Alice* and *Nineteen Fifty-Six* were called to a meeting with UA administrators, where they were informed that the University would be suspending both magazines indefinitely.  As justification for the decision,  UA Administrators stated that because the magazines' content was purportedly geared toward targeted audiences, namely women and/or Black people, the magazines constitute "unlawful proxies" for discrimination on the bases of sex and race.

6.      Defendants based their "unlawful proxy" justification on a non-binding memorandum for all federal agencies, entitled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination," issued by United States Attorney General Pam Bondi on July 29, 2025 ("Bondi Memo" or "Memorandum").[3]

7.      The Bondi Memo does not explicitly mention student-operated and university-funded publications that present specific editorial perspectives about race or gender. Nor does the Memorandum explicitly mention student-operated and university-funded publications that focus on the interests and experiences of students of a particular race or gender. In fact, the Bondi Memo makes no mention of student-operated and university-funded publications, nor does it address

---

[2] Nineteen Fifty-Six, Who We Are?, https://1956magazine.ua.edu/about/ (last visited Mar. 16, 2026).

[3] Memorandum from Pam Bondi, U.S. Attorney General, to Federal Agencies (Jul. 29, 2025), https://www.justice.gov/ag/media/1409486/dl (last visited Feb. 24, 2026).

students' First Amendment rights when participating in student-operated and university-funded publications.

8.      Defendants have a constitutional obligation not to engage in viewpoint discrimination against their students, even when the forum is one of its own creation. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The Bondi Memo does not reference, in any way, this constitutional obligation.

9.      Defendants suspended *Alice* and *Nineteen Fifty-Six* because of their editorial viewpoints, while allowing other University-funded student publications—with different editorial viewpoints—to continue operating.

10.     Furthermore, Defendants' purported reason for suspending and defunding *Alice* and *Nineteen Fifty-Six*—the makeup of their respective audiences—is a prohibited form of viewpoint discrimination. It prohibits Plaintiffs from communicating their viewpoints because Defendants deem those viewpoints to be of interest to particular audiences. Just as the government cannot exclude from a public forum speech on the topic of religion that may be of interest to people of particular religions, the government cannot exclude speech because it believes the viewpoints expressed may be of particular interest to women and Black students.

11.     Plaintiffs bring this First Amendment lawsuit seeking declaratory and injunctive relief to reverse the ongoing and unconstitutional suspension of *Alice* and *Nineteen Fifty-Six* due to their disfavored viewpoints and restore their right to speak through their publications without discriminatory interference from the University.

## **PARTIES**

### I.  **Plaintiffs**

12.     **Plaintiff Rihanna Pointer** is a sophomore at UA, double majoring in Psychology and Political Science with a minor in Sociology. During Rihanna's freshman year, she served as a

contributing writer to *Nineteen Fifty-Six*. Before the suspension of *Nineteen Fifty-Six,* Rihanna served on the magazine's editorial board as a multi-media editor. In her roles with the magazine, Rihanna wrote several articles, published a poem, interviewed students and faculty, and managed the magazine's podcast and YouTube accounts. Prior to UA's suspension of *Nineteen Fifty-Six*, Rihanna planned to pursue the position of writing editor or editor-in-chief for the magazine.

13.    **Plaintiff Grant Sturdivant** is a junior at UA, majoring in Creative Media and minoring in Art and Business. During Grant's sophomore year, he served as a contributing photographer with *Nineteen Fifty-Six*. In Spring 2025, he accepted a position as assistant photography editor for the magazine. Prior to UA's suspension of *Nineteen Fifty-Six*, Grant served as the magazine's photography editor, and he planned to retain this position or apply for the editor-in-chief position in the next academic year.

14.    **Plaintiff Jaleel Matanmi** is a sophomore at UA, majoring in Public Relations and minoring in Philosophy. After transferring to UA in Fall 2025, Jaleel joined *Nineteen Fifty-Six*'s editorial board as a social media strategist contributor. Prior to UA's suspension of *Nineteen Fifty-Six*, Jaleel planned to pursue the paid position of engagement editor for the upcoming school year.

15.    **Plaintiff Jermaine Ball** is a senior at UA, majoring in African American Studies with a minor in News Media. During his time at UA, Jermaine took on several roles for *Nineteen Fifty-Six*, including contributing writer and managing editor. Prior to UA's suspension of *Nineteen Fifty-Six*, Jermaine planned to contribute to its Spring 2026 issue.

16.    **Plaintiff Timoni Taite** is a sophomore at UA, majoring in Business with a minor in Advertising and Public Relations. Timoni's sister, Tionna Taite, founded *Nineteen Fifty-Six* five years ago in 2020. Prior to UA's suspension of *Nineteen Fifty-Six*, Timoni planned to follow in his sister's footsteps by contributing to the magazine. Timoni was considering applying to join

*Nineteen Fifty-Six*'s engagement team and wanted to create new content for the magazine's social media platforms. As part of his application to join *Nineteen Fifty-Six*, he planned to propose several projects to expand the footprint of the magazine and increase social media engagement including a student trivia segment and passing around cards with words of affirmation to students on campus to shed light on the importance of mental health.

17.    **Plaintiff Gabrielle Gunter** is a graduate student at UA, pursuing a Master of Arts in Women's Studies. For two years, Gabrielle served as a fashion editor for *Alice*. In Spring 2025, Gabrielle served as web editor. Prior to UA's suspension of *Alice*, Gabrielle served as *Alice*'s editor-in-chief.

18.    **Plaintiff Sara Beth Caddell** is a sophomore at UA, majoring in Nursing. Prior to UA's suspension of *Alice*, Sara Beth served as web editor, managing creative and digital content for the magazine. Prior to UA's suspension of *Alice*, she planned to pursue the role of editor-in-chief.

19.    **Plaintiff Emmy Waugh** is a junior at UA, majoring in Creative Media. Prior to UA's suspension of *Alice*, Emmy served as an assistant photo editor for *Alice* and planned to pursue the role of head photo editor or editor-in-chief next school year.

**II. Defendants**

20.    Defendants are members of the University of Alabama Board of Trustees and, in their official capacities, are responsible for the "entire management and control over the activities, affairs, operations, business, and property of the University of Alabama System."[4]

---

[4] The Board of Trustees of The University of Alabama Board Manual, Art. 1, The Board of Trustees, UA (Feb. 17, 2026), https://uasystem.edu/images/documents/board/manual/Board-Manual.pdf.

6

21.    **Defendant Scott Phelps** is President pro tempore of the University of Alabama Board of Trustees. As President Pro Tempore, Defendant Phelps "shall preside at all Board meetings in the absence of the Governor and shall call special meetings of the Board upon conditions hereinbefore set out."[5] Defendant Phelps is sued in his official capacity as President pro tempore.

22.    **Defendants Mike Brock, Karen Brooks, Myla E. Calhoun, Angus R. Cooper III, Ronald Gray, Jeff Gronberg, O.B. Grayson Hall Jr., Barbara Humphrey, W. Davis Malone III, Evelyn VanSant Mauldin, Harris Morrissette, J. Steven Roy, Kenneth Simon, Kenneth Vandervoort and Kay Ivey** are members of the University of Alabama Board of Trustees. Each board member's duties include establishing "policies and goals of the University, . . . direct[ing] the Chancellor to implement and achieve those policies and goals," and reviewing and approving "annual budgets and budget changes."[6] Defendants are sued in their official capacities as members of the University of Alabama Board of Trustees.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

24.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

---

[5] The Board of Trustees of The University of Alabama Board Manual, Art. 3, § 1; Officers, UA (Feb. 17, 2026), https://uasystem.edu/images/documents/board/manual/Board-Manual.pdf.
[6] *Supra* note 5, Art. 1 § 6.

25.    The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and Rule 57 of the Federal Rules of Civil Procedure.

**FACTUAL ALLEGATIONS**

I.    **UA's Office of Student Media and Media Planning Board**

26.    The Office of Student Media ("OSM") at UA provides a place for students "to build communication skills, think critically, collaborate with others, and get ready for careers that cross industries, continents, and cultures."[7] Accordingly, OSM's goal is to train students to create high-quality content, and students "do it with the freedom to report responsibly, without censorship, while keeping things socially aware and financially smart."[8]

27.    Defendants recognize the importance of fostering UA students' critical thinking and preparing them for careers in differing "industries, continents, and cultures" through UA's student media activities.

28.    The Media Planning Board ("MPB"), a standing committee of UA, is "empowered by and responsible to the President of the University through the Vice President for Student Life."[9] The MPB is governed by the charter of The University of Alabama Media Planning Board ("Charter").[10]

---

[7] The University of Alabama, Student Media, About, https://studentmedia.sl.ua.edu/about/ (last visited Mar. 16, 2026).

[8] *Id.*

[9] The University of Alabama, Student Media, Media Planning Board Charter, Charter of The University of Alabama Media Planning Board, https://studentmedia.sl.ua.edu/planning-board/media-planning-board-charter/#revised (last visited Mar. 16, 2026).

[10] The University of Alabama, Student Media, Media Planning Board Charter, Charter of The University of Alabama Media Planning Board, https://studentmedia.sl.ua.edu/planning-board/media-planning-board-charter/#revised (last visited Mar. 16, 2026).

29.     MPB has jurisdiction over the *Black Warrior Review*, a nationally-known literary magazine featuring fiction, poetry, and literary essays, published by graduate students in the University's Creative Writing Program; *The Crimson White*, the official student newspaper of The University of Alabama; *Marr's Field Journal*, a literary magazine highlighting creative student fiction, poetry, photography, art, dance, and musical composition that is written, edited and published by undergraduate students; *Southern Historian*, an annual journal of Southern history that is written, edited, and produced by graduate students in the University's history department; *Bama Life Newsletter*, an email newsletter that shares brief and entertaining news with undergraduate students; *WVUA-FM*, the radio station for the University of Alabama community; and other student media enterprises, recognized by MPB to be within its jurisdiction.[11] Prior to UA's suspension of *Alice* and *Nineteen Fifty-Six*, the MPB had jurisdiction over both magazines.

30.     MPB has the chief responsibility of providing "oversight, guidance and support to student media at The University of Alabama through the professional and practical expertise of its members."[12] In providing this general oversight, guidance, and support to student media enterprises, MPB "safeguards their interests, including their financial stability and editorial independence."[13]

31.     Defendants, therefore, recognize the importance of UA student media's editorial independence.

32.     UA students are appointed to leadership positions in each student media enterprise under MPB's jurisdiction and, in those positions, are responsible for the enterprise's daily

---

[11] *Id*.
[12] *Id*.
[13] *Id.*

management; however, they also are "supported and supervised as necessary and appropriate by the full-time professional staff of UA Student Media."[14]

33.    MPB is responsible for ensuring that "the Vision and Mission of UA Student Media are fulfilled."[15] MPB's responsibilities include, but are not limited to, "assisting in the protection of [the enterprise's] freedom of speech and expression;" "establish[ing] and monitor[ing] uniform financial procedures for media groups;" "discontinuing the affiliation with any student medium under its jurisdiction, subject to the procedures outlined [in the charter];" "appoint[ing] the student leader(s) of each media enterprise under the jurisdiction of the MPB;" and "connecting student media with professional associations that would enhance their respective enterprise's development."[16]

34.    UA students' right to freedom of speech and expression are so important that MPB's responsibilities expressly include assisting in the protection of those rights with respect to UA student media enterprises.

35.    MPB's Charter provides that "[f]reedom of expression is guaranteed by the First Amendment to the Constitution of the United States. Accordingly, it is the responsibility of the Board to ensure a free student press and to resist interference with this principle."[17]

36.    The Charter explicitly provides that "[s]tudent media at the University of Alabama *are designated as public forums* for the free and responsible discussion of ideas and issues on campus."[18]

---

[14] *Id.*

[15] *Id.*

[16] The University of Alabama, Student Media, Media Planning Board Charter, Charter of The University of Alabama Media Planning Board, § VII, https://studentmedia.sl.ua.edu/planning-board/media-planning-board-charter/#revised (last visited Mar. 16, 2026).

[17] *Id.*, Preamble.

[18] *Id.* (emphasis added).

37.     In addition, MPB's Charter provides that "[s]tudent media shall be free of censorship and advance approval of content. Its editors and managers shall be free to develop their own editorial policies and make all content decisions. Editors and managers of student media shall be protected from suspension and removal because of student, faculty, administrative or public disapproval of editorial policy and content."[19]

38.     MPB is explicitly prohibited from "engag[ing] in censorship, prior restraint, or any other action concerning content which would be a violation of the enterprises' First Amendment rights;" "order[ing] the publication of specific information;" and "consider[ing] for affiliation any student media enterprise with an espoused ideological, sectarian, religious, or partisan political editorial policy."[20]

39.     UA student media enterprises have access to a range of publication and editorial resources from the University to enable them to develop and publish issues regularly. These resources include University office space with editing software and computers, technological equipment available for rental from OSM, and UA faculty advisors.

40.     Each student media enterprise has its own website, social media profiles, and trademark, but they are all owned by the University.

41.     OSM and MPB, through UA Student Media staff, provide University funding to student media enterprises within the jurisdiction of MPB ("UA Student Media Funds").[21]

## II.  Student Media Enterprise *Alice*

42.     In November 2015, a group of UA students published *Alice*'s first issue. *Alice* is a "publication by and for college women" that serves as an accessible source to the UA community

---

[19] *Id.*
[20] *Id.*
[21] *Id.*

11

"regarding all things college."[22] The magazine covers a wide array of topics, including fashion, beauty, entertainment, and food but also tackles "serious issues young women face, like the gender wage gap and sexual health."[23]

43.    Plaintiff Gunter had several articles published in multiple issues of *Alice*, including "*Caring about Carabiners*" in Volume 10, Issue 1. In this article, Gunter discusses the subtle ways that people identify as queer in public without vocalizing it. In Volume 11, Issue 1, of *Alice*, Gunter's article "*The Elephant in the Womb*" discusses the impact of Alabama's abortion ban, the political climate surrounding issues of reproductive justice, and the effect of these issues on college students.

44.    Pursuant to the magazine's mission statement, *Alice* "focus[es] on college women," but its "belief in inclusivity extends far beyond the content [it produces]"—content that the publication seeks to be accessible for "anyone and everyone."[17]

45.    Articles in *Alice*'s most recent issue discuss topics that include body image, skin care, misogyny in heavy metal music, the graduate school application process, and students' part-time jobs.

46.    Prior to UA's suspension of the magazine, *Alice* published two issues per academic year: a fall issue and a spring issue. For each issue, *Alice* printed paper copies and published an electronic version on *Alice*'s website. *Alice* received approximately $16,000 from UA Student Media Funds per academic year.

47.    Prior to UA's suspension of the magazine, UA students who were interested in joining *Alice* applied via a form available on the magazine's website.

---

[22] Mission Statement, Alice Magazine, Vol 11 Issue 1.
[23] *Id.*

48.     Participation on *Alice*'s editorial board was open to all UA students, regardless of race or gender. The ability to contribute to *Alice* was also open to all UA students, regardless of race or gender. Whenever a new issue of *Alice* was ready for circulation, all UA students, regardless of race or gender, were able to read the issue via a print copy or *Alice*'s website.

49.     *Alice* employed numerous UA students as editors and contributors and worked with several UA faculty advisors.[24] *Alice*'s staff was divided into three teams: the digital team, the creative team, and the writing team.[25] Six of *Alice*'s editors received monthly stipends from the University for their work on the magazine. Over the last several years, *Alice* has received multiple awards and honors, including the Pacemaker Award from the Associated Collegiate Press in 2016, Best Magazine Spread (Third Place) from the College Media Association Apple in 2017, Best Student Magazine from the Society of Professional Journalists Mark of Excellence Region 3 in 2021, and Best Magazine (Third Place) from the Southeast Journalism Conference in 2025.[26]

50.     Since its founding, *Alice* has employed a multiracial, gender-diverse group of UA students as editors, contributors, and other staff. UA students of all races and gender identities learned about *Alice* and its editorial perspectives by participating in "Get on Board Day," a campus-wide student organization recruitment event that  serves as "a springboard for any student who wishes to get more actively engaged with campus by connecting our students to hundreds of organizations, community vendors, and departments housed on the UA campus;"[27] attending *Alice*'s issue launch parties, which were open to all students; reading paper copy issues of *Alice*

---

[24] Alice, About, https://alice.ua.edu/about/ (last visited Mar. 16, 2026).
[25] Alice, Join the Team, https://alice.ua.edu/join-the-team/ (last visited Mar. 16, 2026).
[26] The University of Alabama, Student Media, Awards and Honors, https://studentmedia.sl.ua.edu/awards-and-honors/accolades-alice/ (last visited Mar. 16, 2026).
[27] The University of Alabama, Student Involvement, Get on Board Day, https://studentinvolvement.sl.ua.edu/get-involved/get-on-board-day/ (last visited Mar. 16, 2026).

from UA newsstands or digital issues from its website; and following the publication's social media handles.

### III. Student Media Enterprise *Nineteen Fifty-Six*

51.    In 2020, Tionna Taite, the founder of *Nineteen Fifty-Six*, developed the initial concept of the magazine. The first issue of *Nineteen Fifty-Six* launched in September 2020.

52.    *Nineteen Fifty-Six* was named after the year when Autherine Lucy Foster became the first Black student to enroll at UA.

53.    *Nineteen Fifty-Six*'s mission is to "amplif[y] Black voices within the University of Alabama's community" and "educate students from all backgrounds on culturally important issues and topics."[28] *Nineteen Fifty-Six* covered various topics in connection with its mission, including "current events in national and local news, pop culture, [and] the arts."[29]

54.    Plaintiff Pointer contributed several short form articles to *Nineteen Fifty-Six*'s website. In September 2025, *Nineteen Fifty-Six*'s "Experiences" column included her article "*Breaking the Stigma: An Exploration of the 'Too Much' Perception for Women of Color.*" In November 2025, *Nineteen Fifty-Six* published her articles "'*In the Black' Extra Feature- Nichole Wright: Overcoming Stereotypes in Nursing*" and "*Capturing the Chaos: Gus Robinson's Photographs of the 1956 Tuscaloosa Riots*" in its "Features" and "Culture" columns, respectively.

55.    Plaintiff Ball had several articles published in multiple issues of *Nineteen Fifty-Six*. In Volume 4, Issue 2, of *Nineteen Fifty-Six*, Ball's article titled "*Redefining Family*," which discussed the growing recognition and acceptance of alternative familial structures, included

---

[28] Nineteen-Fifty Six (Fall 2025 Issue) at 3, https://www.yumpu.com/en/document/read/70864122/nineteen-fifty-six-fall-2025-in-the-black/1.

[29] Nineteen Fifty-Six, Who We Are?, https://1956magazine.ua.edu/about/ (last visited Mar. 16, 2026).

interviews with single parents, the Chief Program Officer for an LGBTQ organization working to combat homelessness, and an assistant professor at UA. *Nineteen Fifty-Six* published Ball's article titled "*Injustice on a Global Scale*" in Volume 5, Issue 2, and this piece shared how American individualism impacts the way that Black people in America view injustice around the world.

56.    Articles in the most recent issue of *Nineteen Fifty-Six* included topics such as mentorship in the Black community, success stories of professionals across various disciplines, navigation of Black identity in the workplace, and perspectives on being a Black person in law enforcement.

57.    Prior to UA's suspension of the magazine, *Nineteen Fifty-Six* published issues biannually. Paper copies of *Nineteen Fifty-Six* were available at the OSM store, the UA student center, and campus newsstands.[30] An electronic version of each issue of *Nineteen Fifty-Six* was also accessible on its website. Additionally, *Nineteen Fifty-Six* published weekly online and social media content on its website and social media accounts.

58.    Interested UA students could apply for positions with *Nineteen Fifty-Six* through a form made available on the magazine's website. The *Nineteen Fifty-Six* application was "open to all students at UA," regardless of race or gender.[31]

59.    Participation on *Nineteen Fifty-Six*'s editorial board, as well as the ability to contribute to or receive its issues and other media content, was also open to all UA students, regardless of race or gender.

60.    *Nineteen Fifty-Six* had thirteen editors and dozens of student contributors at the time of its suspension by Defendants.[32] During the 2025-2026 academic year, several *Nineteen Fifty-*

---

[30] *Id.*
[31] *Id.*
[32] *Id.*

15

*Six* editors received stipends for their work on the magazine. *Nineteen Fifty-Six* received approximately $12,000 from UA Student Media Funds each academic year.

61.    Over the last several years, *Nineteen Fifty-Six* has received multiple awards and honors, including Feature Magazine (Sixth Place) from the Associated Collegiate Press in 2020, Best Magazine Cover (Third Place) from the Associated Collegiate Press in 2021, Best Ongoing Student Magazine from the Society of Professional Journalists Mark of Excellence Region 3, and Design Of The Year Magazine Cover from the Associated Collegiate Press Pacemaker Award in 2024.[33]

62.    Since its founding, *Nineteen Fifty-Six* has employed a multiracial, gender-diverse group of UA students as editors, contributors, and other staff. UA students of all races and gender identities learned about *Nineteen Fifty-Six* and its editorial perspectives by participating in "Get on Board Day";[34] attending *Nineteen Fifty-Six*'s issue launch parties, which were open to all UA students; reading paper copies of *Nineteen Fifty-Six* at newsstands and digital copies on its website; and following the publication's social media handles.

## IV. The Bondi Memo

63.    On July 29, 2025, U.S. Attorney General Pam Bondi issued a memorandum for all federal agencies, entitled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination." The Memorandum "identifies 'Best Practices' as non-binding suggestions to help entities comply with federal antidiscrimination laws and avoid legal pitfalls" and concedes that

---

[33] The University of Alabama, Awards and Honors, https://studentmedia.sl.ua.edu/accolades-nineteen-fifty-six/ (last visited Mar. 16, 2026).
[34] The University of Alabama, Student Involvement, Get on Board Day, https://studentinvolvement.sl.ua.edu/get-involved/get-on-board-day/ (last visited Mar. 16, 2026).

these non-binding suggestions "are not mandatory requirements but rather practical recommendations to minimize the risk of violations."[35]

64.     In Section IV of the Memorandum, Attorney General Bondi discusses prohibitions on the use of proxies for protected characteristics. Specifically, the Memorandum states that "[u]nlawful proxies occur when a federally funded entity intentionally uses ostensibly neutral criteria that function as substitutes for explicit consideration of race, sex, or other protected characteristics."[36] The Memorandum also provides examples of "potentially unlawful proxies," such as "'cultural competence' requirements," "geographic or institutional targeting," and "'overcoming obstacles' narratives of 'diversity statement.'"[37]

65.     The Memorandum does not mention student publications nor suggest that student publications may constitute or run the risk of constituting "unlawful proxies."

66.     The Memorandum neither places any conditions on federal funding, explicitly binds universities or any other federally funded educational entities, nor otherwise establishes any new legal obligations for UA.

67.     Recent guidance from the U.S. Department of Education—which included legal interpretations of antidiscrimination law similar to the Memorandum but, unlike the Memorandum, imposed explicit requirements on federal grant recipients—was successfully challenged in three separate lawsuits with three different federal courts preliminarily enjoining its enforcement. *See* Order of Judgment, *Am. Fed'n of Teachers v. United States Dep't of Educ.*, No. 1:25-cv-00628-SAG (D. Md. Aug. 14, 2025), ECF No. 84 (enjoining the Department of Education's "Dear

---

[35] Memorandum from Pam Bondi, U.S. Attorney General, to Federal Agencies (Jul. 29, 2025), https://www.justice.gov/ag/media/1409486/dl (last visited Mar. 16, 2026).
[36] *Id.* at 5.
[37] *Id.*

17

Colleague" letter advancing similar legal theories); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *9 (D.N.H. Apr. 24, 2025); Order, *NAACP v. United States Dep't of Educ.*, No. 25-CV-1120 (DLF) (D.D.C. Apr. 24, 2025), ECF No. 31.

68.     The U.S. Department of Education declined to challenge these court rulings and withdrew its appeal of the order in *American Federation of Teachers*. *See Am. Fed. of Teachers*, Order, No. 1:25-cv-00628 (D. Md. Jan. 22, 2026), ECF No. 89 (USCA granting Department's voluntary dismissal of appeal of order granting, in part, summary judgment in favor of plaintiffs). The U.S. Department of Education settled the remaining two cases, agreeing not to enforce the challenged guidance and related requirements and not to issue a similar guidance with similar requirements in the future. Joint Motion to Dismiss, *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 1:25-cv-00091-LM (D. Md. Feb. 2, 2026), ECF No. 99 (Feb. 2, 2026) (dismissing case in light of unappealed binding order in *Am. Fed'n of Teachers v. United States Dep't of Educ.*); Joint Motion to Dismiss, *NAACP v. United States Dep't of Educ.*, No. 1:25-cv-01120-DLF (D. D.C. Feb. 6, 2026) (same).

## V.  Suspension and Funding Termination of *Alice* and *Nineteen Fifty-Six*

69.     On December 1, 2025, UA administrators invited the editors-in-chief of both *Alice* and *Nineteen Fifty-Six* to separate meetings to discuss their magazines. Plaintiff Gunter attended this meeting as the editor-in-chief for *Alice*.

70.     During each of these meetings, UA notified the editor-in-chief for *Alice* and *Nineteen Fifty-Six*, respectively, that the University had suspended their magazines, effective immediately.

71.     UA administrators advised the editors-in-chief for both *Alice* and *Nineteen Fifty-Six* to invite editors and contributors for both magazines to a meeting at 5:00 P.M. that same day to discuss the suspension of the magazines.

72.     At the 5:00 P.M. meeting, UA administrators informed contributors and editors of both *Alice* and *Nineteen Fifty-Six* that UA had suspended the magazines. In response to the news, several students, including some plaintiffs, became visibly upset and many were confused.

73.     When UA students asked, during the 5:00 P.M. meeting, for the reason for the magazines' suspension, Vice President of Student Life Steven Hood "told the staff of each magazine . . . that because the magazines target primarily specific groups, they are 'unlawful proxies,'" referencing the Bondi Memorandum.[38]

74.     Several students clarified to UA administrators at the 5:00 P.M. meeting that the magazines do not bar participation based on protected characteristics and that both magazines included editors and contributors who are not women and who are not Black.

75.     During the 5:00 P.M. meeting, Plaintiff Gunter asked UA administrators why the suspension of *Alice* and *Nineteen Fifty-Six* was not a violation of the students' First Amendment rights. Vice President Hood responded that the content of *Alice* and *Nineteen Fifty-Six* was not the problem leading to the suspensions; instead, the problem was the magazines' audiences.

76.     Plaintiff Gunter explained that, according to *Alice's* mission statement, the magazine is published for everyone and that *Alice* never excluded anyone from participating on the editorial board or contributing to the magazine. Vice President Hood responded that he understood Gunter's concern but that the magazine nevertheless appears to be a magazine for women.

---

[38] Maven Navarro and Jacob Ritondo, *University suspends Alice, Nineteen Fifty-Six student magazines*, THE CRIMSON WHITE (Dec. 1, 2025), https://thecrimsonwhite.com/125358/news/university-suspends-alice-nineteen-fifty-six-student-magazines/.

77.     To the extent *Alice* appears to be a magazine for women, despite being open to all students, that appearance results from the magazine's mission statement and its editorial perspectives that influence the content of its publications.

78.     When asked during the 5:00 P.M. meeting, UA administrators informed the editorial boards of both *Alice* and *Nineteenth Fifty-Six* that the suspension of the magazines was not related to Senate Bill 129, an Alabama state law prohibiting so-called diversity, equity, and inclusion initiatives.

79.     During the 5:00 P.M. meeting, UA administrators also informed students that the University planned on creating another student magazine and wanted students on the staff of *Alice* and *Nineteen Fifty-Six* to support the new publication. However, UA did not assure the students that their viewpoints and editorial perspectives, as expressed in *Alice* and *Nineteen Fifty-Six* and pursuant to those magazines' missions, would be welcomed and included in the proposed new publication.

80.     UA administrators further informed the students at the 5:00 P.M. meeting that the staff of *Alice* and *Nineteen Fifty-Six* would lose access to the magazines' UA-affiliated trademarks, social media handles, websites, advising, and student media campus facilities.

81.     The University did not suspend any other UA student media enterprises under the purview of MPB, including *The Crimson White*, *Marr's Field Journal*, *Black Warrior Review*, and the *Southern Historian*, which all continue to receive funding from UA Student Media Funds and have access to resources and services provided by OSM and MPB.

82.     An article published in *The Crimson White* quotes a UA administrator saying that the suspension of *Alice* and *Nineteen Fifty-Six* was necessary to "ensure all members of our community feel welcome to participate in the programs that receive funding from the Office of

Student Media."[39] The UA administrator further stated that closure of those magazines was necessary "under the compliance landscape."[40]

83.    An unnamed University spokesperson said that UA "hope[d] to work with students to develop a new publication that features a variety of voices and perspectives to debut in the new academic year."[41]

## VI. Impact of *Alice* and *Nineteen Fifty-Six* Suspensions on Plaintiffs

84.    Following the University's suspension of *Alice* and *Nineteen Fifty-Six*, both publications ceased operations.

85.    Both magazines are no longer eligible for UA Student Media Funds, and the magazines' editorial boards can no longer access OSM and MPB's resources reserved for MPB affiliated student media enterprises, such as office space, equipment rental, and staff advisors.

86.    The University continues to honor the contracts of editors that receive stipends from the University for their work on *Alice* and *Nineteen Fifty-Six* for the 2025-2026 academic year. However, students will not be able to apply for paid positions on the magazines' editorial boards due to the University's suspension of *Alice* and *Nineteen Fifty-Six*.

87.    Moreover, UA students are prohibited from using the trademarks of *Alice* and *Nineteen Fifty-Six*, which includes social media handles, websites, and physical distribution through student media newsstands that previously had circulated *The Crimson White*, *Alice*, and *Nineteen Fifty-Six*.

88.    Plaintiffs have been irreparably harmed by the magazines' suspensions.

---

[39] Maven Navarro & Jacob Ritondo, *University Suspends Alice, Nineteen Fifty-Six Student Magazines* (Dec. 1, 2025), https://thecrimsonwhite.com/125358/news/university-suspends-alice-nineteen-fifty-six-student-magazines/.
[40] *Id.*
[41] *Id.*

89.      Due to the University's suspension of *Nineteen Fifty-Six*, Plaintiff Pointer lost the opportunity to pursue the position of *Nineteen Fifty-Six*'s editor-in-chief role, which would have provided her with an important opportunity to hold a leadership role in a UA student organization and contribute to *Nineteen Fifty-Six*'s mission, messaging, and success.

90.      In addition, Plaintiff Pointer is unable to participate in the production of a UA magazine with a mission and editorial perspective that would give her an opportunity to express her views as a Black student at UA. Her work on *Nineteen Fifty-Six* had been a "joyful" experience that expanded her horizons with various writing opportunities to share her views on race, Black history, politics, and other related subject matter within the magazine's mission.

91.      For Pointer, the mission and/or editorial perspectives of other student publications do not provide her with the opportunity she had through *Nineteen Fifty-Six* to express her viewpoints. For example, *The Crimson White* is a student newspaper that covers current events, whereas *Nineteen Fifty-Six* was a lifestyle magazine with specific themes picked for each issue that allowed for deeper, long-form content on curated topics concerning the experiences and interests of Black UA students. Moreover, Pointer is an undergraduate student and, therefore, is ineligible to participate in the *Southern Historian*, which is written and edited by UA graduate students.

92.      Plaintiff Ball has written several articles for *Nineteen Fifty-Six* on a variety of topics, including the importance of students' involvement in campus activities to combat feelings of isolation and homesickness; growing acceptance of alternative familial structures as equally valid as the prototypical "nuclear family" structure; and the role of American individualism in Black Americans' view of injustice around the world. These longform articles seek to amplify Black voices and educate the UA campus community on culturally important issues pursuant to

22

*Nineteen Fifty-Six*'s mission, and this editorial perspective is not shared within UA's other student publications. For Ball, *Nineteen Fifty-Six* was a space on campus that was meant for community building, professional development, and an opportunity for students with similar experiences and/or interests to express their views and opinions to the larger campus community.

93.     As a senior at UA, Plaintiff Ball had planned to continue supporting *Nineteen Fifty-Six* by contributing a written article in its Spring 2026 issue. To no longer be able to do so is incredibly upsetting to Ball, who viewed the opportunity to contribute written work to the magazine as both a privilege and an honor.

94.     It is further upsetting to Plaintiff Ball, as a Black UA student, that his own university considers it to be inappropriate for a student magazine to amplify Black voices and share editorial perspectives and opinions of interest to Black students like him, especially given how these viewpoints are often excluded or minimized on campus.[42]

95.     Plaintiff Sturdivant has contributed dozens of photographs to accompany a variety of different articles in several issues of *Nineteen Fifty-Six*. For example, an article titled "*Creating Camaraderie on Campus*" discussed the methods UA students use to find community and cultivate relationships within the student body and included Sturdivant's photograph of several students in the library, below, showing *Nineteen Fifty-Six*'s readership how students gather on campus.

---

[42] *See generally*, Miles Parks, Daniel Ofman, et al., *University of Alabama suspends student magazines amid DEI crackdown*, NPR (Dec. 20, 2025), https://www.npr.org/2025/12/20/nx-s1-5633235/university-of-alabama-suspends-student-magazines-amid-dei-crackdown (interview with the former editor of *Nineteen Fifty-Six* where she states that "I think [the suspension of *Alice* and *Nineteen Fifty-Six* is] definitely a part of a bigger issue that's definitely been happening. The state of Alabama passed the state bill 129, which passed, I believe, a year ago and kind of resulted in the removal of our Black student union office as well as other LGBTQIA+ safe spaces and things like that on campus and kind of resulted in the renaming of a lot of former diversity, equity and inclusion spaces. So this event and that kind of ties into what I believe is a bigger issue.")



96.     Due to the University's suspension of *Nineteen Fifty-Six*, however, Plaintiff Sturdivant is unable to further develop the skills that he gained from participation on the editorial board for *Nineteen Fifty-Six* that would have helped his future career path as a photojournalist.

97.     Additionally, Plaintiff Sturdivant is now denied an opportunity to publish his photography in an established, well-known publication that allows him to develop a photography portfolio expressing his point of view, which had aligned with *Nineteen Fifty-Six*'s mission and editorial perspective. It also saddens Sturdivant that the ideas and viewpoints expressed in his photography for *Nineteen Fifty-Six*, highlighting Black students and their experiences on campus, would be so disfavored by UA to be banned.

98.     Plaintiff Matanmi was looking forward to applying for the position of *Nineteen Fifty-Six*'s engagement editor and planned to create documentaries, "mockumentaries," and trivia-style videos for the magazine's social media handles. The University's suspension of *Nineteen*

*Fifty-Six*, however, has thwarted these plans to create content that expressed the magazine's viewpoints and his own.

99.    Following UA's suspension of *Nineteen Fifty-Six*, Plaintiff Matanmi attended a meeting for the new magazine that UA intends on creating to replace *Nineteen Fifty-Six* and *Alice*. However, Matanmi decided not to join the new publication because he does not believe that the perspectives and views shared in *Nineteen Fifty-Six* are welcomed and does not believe that the new magazine will highlight and amplify the experiences of Black students at UA. This makes Matanmi feel like the University does not care about his experiences or those of other Black students and does not consider it worthwhile for those experiences and perspectives to be shared with the rest of the campus community.

100.    Plaintiff Taite planned to follow in his sister's footsteps by contributing to the magazine that his sister founded, *Nineteen Fifty-Six*. Taite wanted to serve as a model for *Nineteen Fifty-Six* and join the engagement team to help build the magazine's social media presence. Upon learning of *Nineteen Fifty-Six*'s suspension by the University, Taite became frustrated because he would not be able to use his modeling, social media, and advertising skills to create new content for *Nineteen Fifty-Six*.

101.    For Plaintiff Taite, *Nineteen Fifty-Six* was a publication that encouraged him to show up authentically as a Black person at UA and provided a space for him to showcase his culture and heritage to the larger campus community without fear of censorship. Thus, the University's suspension of *Nineteen Fifty-Six* has devalued his culture, heritage, and experiences as a Black UA student, as unworthy of learning or discussion.

102. Plaintiff Gunter found UA's suspension of *Alice* to be devastating. Gunter, along with other members of *Alice*, have been called "DEI hires" in a derogatory manner due to UA 's reason for suspending the magazine.

103. *Alice* provided Gunter with the opportunity to be in community with other students who care deeply about highlighting the voices and experiences of students from diverse backgrounds on UA's campus. *Alice* also provided Gunter with leadership opportunities and practical skills to use in her future career as an academic. By suspending *Alice*, UA eliminated a community of belonging for Gunter, as well as the opportunity to express her views through the magazine's issues.

104. Plaintiff Caddell helped to completely revamp *Alice*'s website and shadowed Plaintiff Gunter in her editor-in-chief role. Caddell was very disappointed when she learned about *Alice*'s suspension because of the significant time and work she put into the magazine, which has now been ignored and disregarded as unworthy of the University's support. She was also heartbroken about losing the potential opportunity to have her first significant leadership role as editor-in-chief next school year, which would have allowed her to continue using *Alice* as a space to amplify the views of students who have been excluded from other student media on campus. For Caddell, *Alice*'s suspension means that these viewpoints, including her own, will continue to be excluded and that the University does not care about their exclusion.

105. UA's suspension of *Alice* directly impacts Plaintiff Waugh's professional trajectory. In the upcoming academic year, Waugh planned to interview for the positions of head photo editor or editor-in-chief, but those potential leadership opportunities are no longer available due to the University's suspension of *Alice*.

106.    For Plaintiff Waugh, *Alice* served a vital role in UA's student media ecosystem by centering the perspectives and experiences of women, queer people, and transgender people, which Waugh believes are important for all of UA to learn and understand. Waugh has no intention of joining any new publication that UA intends to create as a replacement for *Alice*, as such a publication would not include the views and perspectives that made *Alice* a vital magazine for herself and other students at UA. The absence of student media centering the perspectives and experiences of women, queer people, and transgender people makes clear to Waugh that the University does not value them and does not care if they are erased from campus discourse.

## CLAIMS FOR RELIEF

### COUNT ONE

**Violation of the First Amendment to the U.S. Constitution 42 U.S.C. § 1983**
**Viewpoint Discrimination**
*All Student Plaintiffs Against All Defendants*

107.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

108.    When a university has "created a forum generally open for use by student groups," it "assume[s] an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Widmar v. Vincent*, 454 U.S. 263, 267 (1981); *see also Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1548 (11th Cir. 1997) ("Although the government is not required to create such forums, once it does so the Constitution constrains its power to regulate speech within the forum.").

109.    Governmental efforts to regulate speech based on the "specific motivating ideology or the opinion or perspective of the speaker" is a "blatant" and "egregious" form of impermissible speech restriction. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

27

Moreover, "[f]avoritism of majority views is not an acceptable principle for allocating resources in a limited public forum." *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 102 (2d Cir. 2007) (citing *Rosenberger,* 515 U.S. at 835).

110.    Defendants established a public forum for student media enterprises at UA and distributed University funds to student media enterprises, thereby "opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." *McDonough v. Garcia*, 116 F.4th 1319, 1328 (11th Cir. 2024) (quoting *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010)).

111.    The viewpoints of *Nineteen Fifty-Six* and *Alice* were "evident" from their inception, as expressed in their organizational missions and subsequently in the editorial content of their publications. *Rosenberger*, 515 U.S. at 826. As a "publication by and for college women," *Alice* "serves as an accessible source for all things college," including, fashion, beauty, entertainment, gender, and sexual health.[43] *Nineteen Fifty-Six* is a "student-led magazine that amplifies Black voices within the University" and "seeks to educate students from all backgrounds on culturally important issues and topics in an effort to produce socially conscious, ethical, and well-rounded citizens."[44]

112.    Defendants suspended *Alice* and *Nineteen Fifty-Six* and revoked their funding and support because of the magazines' viewpoints—and the viewpoints of their editors and contributors, including Plaintiffs—about race and gender, which include the magazines' missions

---

[43] Mission Statement, Alice Magazine, Vol 11 Issue 1.
[44] "Dear Black Students," Nineteen Fifty-Six Magazine, Fall 2025, at 3, available at
https://www.yumpu.com/en/document/read/70864122/nineteen-fifty-six-fall-2025-in-the-black/3
(last visited Mar. 19, 2026).

28

to focus on the interests and perspectives of UA students of diverse gender identities and/or Black UA students.

113.    At the same time, Defendants have not suspended and continue to fund and support other UA student media enterprises that do not share the same viewpoints and perspectives about race and gender as *Alice* and *Nineteen Fifty-Six*, including *The Crimson White*, *Marr's Field Journal*, *The Black Warrior Review*, *Southern Historian*, and *WVUA-FM*.

114.    The University's purported reason for suspending and defunding *Alice* and *Nineteen Fifty-Six*—the makeup of their respective audiences—is a prohibited form of viewpoint discrimination. It prohibits Plaintiffs from communicating their viewpoints because Defendants deem those viewpoints to be of interest to particular audiences. Just as the government cannot exclude from a public forum speech on the topic of religion that may be of interest to people of particular religions, the government cannot exclude speech because it believes the viewpoints expressed may be of particular interest to women and Black students.

115.    By censoring Plaintiffs' speech based on the "particular views taken by speakers on a subject," Defendants engaged in the most "egregious type[] of First Amendment violations. *Rosenberger*, 515 U.S. at 829.

116.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have been and will continue to suffer irreparable harm.

### **PRAYER FOR RELIEF**

**WHEREFORE,** in light of the foregoing facts and arguments, Plaintiffs respectfully request that this Court:

117.    Declare Defendants' suspension of *Alice and Nineteen Fifty-Six* as UA student media enterprises and termination of the magazines' University funding to be unconstitutional, in violation of the First Amendment to the United States Constitution;

118.    Issue preliminary and permanent injunctive relief restraining Defendants from suspending *Alice* and *Nineteen Fifty-Six* as UA student media enterprises and terminating their University funding;

119.    Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1998; and

120.    Grant such additional relief as the interests of justice may require.

Dated: March 23, 2026

Respectfully submitted,

/s/ *Avatara A. Smith-Carrington*
Avatara A. Smith-Carrington*
Antonio L. Ingram II*
Emahunn Campbell*
Mide Odunsi*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300

/s/ *Diego Soto*
Michael Tafelski**
Sam Boyd*
Arielle Hudson*
Diego Soto
Brock Boone**
SOUTHERN POVERY LAW CENTER
403 Washington Ave,
Montgomery, AL 36104

/s/ *Alison Mollman*
Alison Mollman
ACLU OF ALABAMA
PO Box 6179
Montgomery, AL 36106
(510) 909-8908

/s/ *Daniel A. Cantor*
Daniel A. Cantor*
ARNOLD & PORTER KAY SCHOLER
601 Massachusetts Ave, NW
Washington, DC 20001-3743
(202) 942-5000

/s/ *Ashley Gammell*
Ashley Gammell*
Ai-Li Chiong-Martinson*
ARNOLD & PORTER KAY SCHOLER
1420 5th Avenue, Suite 1400
Seattle, WA 98101
(206) 288-0110

/s/ *Allyson Myers*
Allyson Myers*
ARNOLD & PORTER KAY SCHOLER
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
(213) 243-4000

** *Admitted in Alabama, application for admission to the Northern District of Alabama forthcoming*
**Pro hac vice application forthcoming*

31