FILED

2026 Mar-31  PM 05:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

|  |  |
|---|---|
| RIHANNA POINTER, GRANT STUR-DIVANT, TIMONI TAITE, JALEEL MATANMI, JERMAINE BALL, SARA BETH CADDELL, GABRIELLE GUNTER, and EMMY WAUGH, <br><br> *Plaintiffs*, <br><br> vs. <br><br> SCOTT PHELPS, in his official capacity as President Pro Tempore University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, ANGUS R. COOPER III, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARABARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDINO, HARRIS MORRIS-SETTE, J. STEVEN ROY, KENNETH SIMON, KENNETH VANDERVOORT and KAY IVEY, in their official capacities as members of the University of Alabama Board of Trustees, <br><br> *Defendants*. | Case No. 7:26-cv-00476-EGL <br><br> *Oral Argument Requested* |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Introduction ..................................................................................................1

Statement of Facts .......................................................................................2

   I.  Background of *Alice* and *Nineteen Fifty-Six* Magazines ...................2

   II. UA's Office of Student Media and Media Planning Board ..............4

   III.The Magazines' Nondiscrimination Policies and Editorial Perspectives .......8

      A. Editorial Perspectives of *Alice* ................................................8

      B. Editorial Perspectives of *Nineteen Fifty-Six* ...........................9

   IV.UA's Suspension and Funding Termination of Magazines ...........11

Argument .....................................................................................................15

   I.  Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their First Amendment Claim. ...............................................16

      A. Defendants' censorship of the viewpoints expressed in *Alice* and *Nineteen Fifty-Six* is presumptively unconstitutional. ..............16

      B. *Rosenberger* holds that universities may not open a public forum for expression of student viewpoints and selectively silence the expression of disfavored viewpoints. ......................................17

      C. Defendants established a public forum for expression by creating the OSM and MPB and distributing UA Student Media Funds and then unconstitutionally silenced *Alice* and *Nineteen Fifty-Six* based on the viewpoints espoused in the magazines. ..........................19

   II. Absent a Preliminary Injunction, Plaintiffs Will Continue to Suffer Irreparable Injury. ..................................................................23

   III.The Balance of Equities Favors Granting a Preliminary Injunction. ............25

   IV.A Preliminary Injunction Would Serve the Public Interest. .........26

Conclusion ..................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cate v. Oldham*,
707 F.2d 1176 (11th Cir. 1983) ..........................................................................29

*Cohen v. Cal.*,
403 U.S. 15 (1971)..............................................................................................28

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ..........................................................................32

*Gay Lesbian Bisexual All. v. Pryor*,
110 F.3d 1543 (11th Cir. 1997) ..........................................................................21

*Healy v. James*,
408 U.S. 169 (1972)............................................................................................21

*Holloman ex rel. Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) ..........................................................................23

*Honeyfund.com Inc. v. Governor*,
94 F.4th 1272 (11th Cir. 2024) ....................................................................22, 29

*KH Outdoor, LLC v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) ..........................................................................31

*McDonough v. Garcia*,
116 F.4th 1319 (11th Cir. 2024) .........................................................................25

*Moms for Liberty v. Brevard Pub. Schs.*,
118 F.4th 1324 (11th Cir. 2024) ...................................................................21, 23

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)............................................................................................26

*Police Dep't of City of Chicago v. Mosley*,
408 U.S. 92 (1972)..............................................................................................22

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)............................................................................................22

*Reineke v. Cobb Cnty. Sch. Dist.*,
  484 F. Supp. 1252 (N.D. Ga. 1980)........................................................................30

*Rosenberger v. Rector & Visitors of the University of Virginia*,
  515 U.S. 819 (1995).................................................................................*passim*

*Transcon. Gas Pipe Line Co. v. 6.04 Acres*,
  910 F.3d 1130 (11th Cir. 2018) ........................................................................31

*Widmar v. Vincent*,
  454 U.S. 263 (1981).........................................................................................21

## Other Authorities

First Amendment...............................................................................*passim*

Federal Rules of Civil Procedure Rule 65(c)...........................................................31

**INTRODUCTION**

This lawsuit challenges The University of Alabama's ("UA" or "University") indefinite suspension and funding termination of two student-operated magazines, *Alice* and *Nineteen Fifty-Six*, because UA administrators disfavor the magazine's editorial perspectives, as well as the perspectives of student contributors, related to gender and race, respectively. The University's suspension of *Alice* and *Nineteen Fifty-Six* and termination of their University funding plainly violates the First Amendment.

In *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819 (1995), the Supreme Court held, in a case presenting nearly identical factual circumstances, that a university's decision to censor a student-operated magazine on the basis of its editorial viewpoint violated the First Amendment. That is exactly what the University has done here.

Plaintiffs, who are editors of and contributors to *Alice* and *Nineteen Fifty-Six*, meet all of the requirements for a preliminary injunction: (1) they have a substantial likelihood of succeeding on the merits of their claim that the University's suspension and funding termination of the magazines violates the First Amendment; (2) their loss of First Amendment freedoms—for even minimal periods of time—constitutes irreparable injury; (3) Defendants have no legitimate interest in suspending the magazines and terminating their University funding, much less one that outweighs

1

Plaintiffs' interests; and (4) an injunction ending the University's infringement of Plaintiffs' First Amendment rights and preserving the free exchange of ideas on UA's campus is in the public interest.

Accordingly, Plaintiffs respectfully request that the Court enter a preliminary injunction, enjoining Defendants from suspending *Alice* and *Nineteen Fifty-Six* and terminating their University funding.

## STATEMENT OF FACTS

### I.    Background of *Alice* and *Nineteen Fifty-Six* Magazines

The University of Alabama welcomed its inaugural class in 1831. In 1893, UA enrolled its first women students. In 1956, UA admitted its first Black student, Autherine J. Lucy.[1] It was not until 1963, however, that UA achieved sustained en-rollment of Black students.

In 2015, UA students launched *Alice* "to help students learn how to feel com-fortable in their journey of navigating college life during this transition from teen to adult years."[2] *Alice* was "the brainchild of a collaborative meeting between faculty and students who decided we have enough material about Big Al,[3] 'so let's make it

---

[1] UA's first Black student, Autherine J. Lucy was admitted in 1956, but she was expelled three days later "for her own safety in response to threats from a mob."

[2] Declaration of Sam Boyd ("Boyd Decl."), Ex. 1.

[3] Big Al is the costumed, elephant mascot of the University of Alabama Crimson Tide in Tuscaloosa, Alabama.

2

about Alice.'"[4] *Alice* covers "fashion, beauty, food and health, wellness, and lifestyle content."[5] In the most recent issue of *Alice*, student editors and contributors wrote stories from their perspective on a wide array of topics, including Black hair, masculine lesbian fashion, queer resistance in the South, and reproductive rights.[6] Over the last several years, *Alice* has received multiple awards and honors, including the Pacemaker Award from the Associated Collegiate Press in 2016, Best Magazine Spread (Third Place) from the College Media Association Apple in 2017, Best Student Magazine from the Society of Professional Journalists Mark of Excellence Region 3 in 2021, and Best Magazine (Third Place) from the Southeast Journalism Conference in 2025.[7]

In 2020, the initial concept for *Nineteen Fifty-Six*—which is named in honor of Autherine Lucy Foster's early efforts to desegregate UA—was developed by the magazine's founder, Tionna Taite. *Nineteen Fifty-Six*'s mission is to "amplif[y] Black voices within the University of Alabama's community" and "educate students from all backgrounds on culturally important issues and topics."[8] *Nineteen Fifty-Six*

---

[4] Declaration of Gabrielle Gunter ("Gunter Decl."), Ex. 5 at 4 [*Mission Statement*, Alice, Fall 2025, at 4, https://www.yumpu.com/en/document/read/70864100/alice-fall-2025/1 (last visited Mar. 26, 2026)].

[5] Boyd Decl., Ex. 1.

[6] *See, e.g.*, Gunter Decl., Ex 5.

[7] Boyd Decl., Ex. 2.

[8] Boyd Decl., Ex. 3 at 3.

publishes a biannual print issue every academic year that features award-winning journalism, photography, and design, along with online content. In the most recent issue of *Nineteen Fifty-Six,* the magazine included topics such as mentorship in the Black community, success stories of professionals across various disciplines, navigating Black identity in the workplace, and perspectives on being a Black person in law enforcement.[9]

## II.    UA's Office of Student Media and Media Planning Board

Prior to the University's suspension of *Alice* and *Nineteen Fifty-Six* both magazines were published by the Office of Student Media ("OSM") at the University. Declaration of Tionna Taite ("Tionna Taite Decl.") ¶ 8; Declaration of Gabrielle Gunter ("Gunter Decl.") ¶ 21. OSM provides a place for students "to build communication skills, think critically, collaborate with others, and get ready for careers that cross industries, continents, and cultures."[10] OSM's goal is to train students to create high-quality content and to "do it with the freedom to report responsibly, without censorship, while keeping things socially aware and financially smart."[11]

The Media Planning Board ("MPB"), a standing committee of UA, is "empowered by and responsible to the President of the University through the Vice

---

[9] Boyd Decl., Ex. 3 at 10-11 (*Contents*).

[10] Boyd Decl., Ex. 4.

[11] *Id.*

President for Student Life."[12] MPB is governed by the charter of the University's Media Planning Board ("Charter").[13] MPB retains jurisdiction over all student media enterprises that seek association with the MPB.[14] Accordingly, the MPB has jurisdiction over the *Black Warrior Review*, a nationally-known literary magazine featuring fiction, poetry, and literary essays published by graduate students in the University's Creative Writing Program; *The Crimson White*, the official student newspaper of the University; *Marr's Field Journal*, a literary magazine highlighting creative student fiction, poetry, photography, art, dance, and musical composition that is written, edited and published by undergraduate students; *Southern Historian*, an annual journal of Southern history written, edited, and produced by graduate students from the University's history department; *WVUA-FM*, the radio station for the UA community; and other media enterprises, as recognized by MPB's jurisdiction.[15] MPB also retains jurisdiction over *Alice* and *Nineteen Fifty-Six*.[16]

MPB has the chief responsibility of providing "oversight, guidance and support to student media at The University of Alabama through the professional and practical expertise of its members."[17] The MPB also "safeguards [student media

---

[12] Boyd Decl., Ex. 5.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

enterprises under the purview of the MPB] interests, including their financial stability and editorial independence."[18] Additionally, work of student media enterprises recognized by the MPB "is supported and supervised as necessary and appropriate by the full-time professional staff of UA Student Media."[19] Accordingly, content and designs produced in *Alice* and *Nineteen Fifty-Six* were produced by students in consultation with professional staff advisors. *See* Gunter Decl. ¶¶ 4, 16; Declaration of Rihanna Pointer ("Pointer Decl.") ¶ 19; Tionna Taite Decl. ¶ 8; Declaration of Emily Waugh ("Waugh Decl.") ¶ 11. OSM and MPB, through UA Student Media staff, provide University funding to student media enterprises within the jurisdiction of MPB ("UA Student Media Funds").[20]

Like other student media enterprises under the jurisdiction of MPB, stipends are provided to the editorial boards for both *Alice* and *Nineteen Fifty-Six. See* Gunter Decl. ¶ 5; Declaration of Grant Sturdivant ("Sturdivant Decl.") ¶ 12; Declaration of Jermaine Ball ("Ball Decl.") ¶ 16; Tionna Taite Decl. ¶ 8. Both magazines shared an office space with editing software and computers, and student staff for both magazines were able to borrow equipment from the OSM. *See* Declaration of Jaleel Matanmi ("Matanmi Decl.") ¶ 17; Pointer Decl. ¶ 19; Tionna Taite Decl. ¶ 8; Gunter

---

[18] *Id.*

[19] *Id.*

[20] Boyd Decl., Ex. 5.

Decl. ¶ 21. Full-time, professional staff of UA Student Media were available to *Alice* and *Nineteen Fifty-Six* staff for assistance and consultation. *See* Tionna Taite Decl. ¶ 8; Pointer Decl. ¶ 19; Gunter Decl. ¶ 21. The University also provided the magazines with websites, social media profiles, and campus distribution spaces that bore the trademark of *Alice* and *Nineteen Fifty-Six*. Tionna Taite Decl. ¶ 8; Gunter Decl. ¶ 21; Matanmi Decl. ¶ 17. The MPB disbursed approximately $8,000 to *Alice* each academic year to publish the magazine biannually. Gunter Decl. ¶ 13. Similarly, *Nineteen Fifty-Six* received funding from MPB each academic year to publish the magazine.[21]

Although the MPB oversees the operations of student media enterprises under its jurisdiction, it is explicitly prohibited from "engag[ing] in censorship, prior restraint, or any other action concerning content which would be a violation of the enterprises' First Amendment rights;" "order[ing] the publication of specific information;" and "consider[ing] for affiliation any student media enterprise with an espoused ideological, sectarian, religious, or partisan political editorial policy."[22] Accordingly, UA did not have editorial oversight with regard to the content of *Alice* and *Nineteen Fifty-Six*, including, but not limited to, the selection of topics, photography, or the design for the magazines. *See* Gunter Decl. ¶ 16; Waugh Decl. ¶ 22.

---

[21] Boyd Decl., Ex. 5.; *id.* Ex. 6.

[22] Boyd Decl., Ex. 5.

### III.    The Magazines' Nondiscrimination Policies and Editorial Perspectives

Participation in *Alice* and *Nineteen Fifty-Six* was open to all students, regardless of race and sex. *See* Ball Decl. ¶ 10; Gunter Decl. ¶ 10; Pointer Decl. ¶¶ 9, 16; Sturdivant Decl. ¶ 16; Tionna Taite Decl. ¶ 9; Waugh Decl. ¶ 9; Matanmi Decl. ¶¶ 9, 12. Demographic information was not collected during the interview process, and there were no requirements for gender- or race-specific content as part of the application process. Ball Decl. ¶ 7; Gunter Decl. ¶ 11; Pointer Decl. ¶¶ 6, 10; Tionna Taite Decl. ¶ 10. Since their inception, *Alice* had editors and contributors who did not identify as women, and *Nineteen Fifty-Six* had editors and contributors who are not Black. Gunter Decl. ¶ 10; Tionna Taite Decl. ¶ 10; Waugh Decl. ¶ 13; Pointer Decl. ¶ 9; Ball Decl. ¶ 10.

#### A.    Editorial Perspectives of *Alice*

While participation in *Alice* was open to all students regardless of race and sex, content published in *Alice* typically reflected the editorial perspectives of students interested in the magazine's mission and related issues about gender and sexuality as they pertain to women and people who do not identify as cisgender men, resulting in articles focusing on a wide array of topics, including fashion, beauty, entertainment, food and tackling "serious issues young women face, like the gender wage gap and sexual health."[23] For example, Plaintiff Gabrielle Gunter had several

---

[23] Gunter Decl. Ex. 5 at 4.

articles published in multiple issues of *Alice*, including "Caring about Carabiners," in Volume 10, Issue 1, of the magazine. Gunter Decl. ¶ 9. In the article, Gunter discusses the subtle ways that queer people identify in public without vocalizing it.[24] In Volume 11, Issue 1, of *Alice*, Gunter's article "The Elephant in the Womb" discusses the impact of Alabama's abortion ban, the political climate surrounding issues of reproductive justice, and the impact of these issues on college students.[25]

Plaintiff Emmy Waugh contributed photo stories to several articles in *Alice* titled "It's a FIBE," "Confessions of a Shopaholic," "Dupe Culture," and "Women in Male Fields." Waugh Decl. ¶ 8. For Plaintiff Waugh, her photo contributions to articles in *Alice* furthered the magazine's mission by providing UA students with visual representation in student media that reflected the diversity of the campus community, helping students to feel comfortable as they navigate their college experience. *Id*. Plaintiff Sara Beth Caddell planned the photos that accompanied a story in *Alice* titled, "Butch! You're Star-Studded," which was written by a transgender man. Declaration of Sara Beth Caddell ("Caddell Decl.") ¶ 5.

### B.    Editorial Perspectives of *Nineteen Fifty-Six*

Likewise, while participation in *Nineteen Fifty-Six* was open to all students regardless of race and sex, content published in *Nineteen Fifty-Six* typically reflected

---

[24] Gunter Decl. Ex. 2 at 17.

[25] Gunter Decl. Ex. 5 at 79.

the editorial perspectives of students interested in the magazine's mission and related issues about race as they pertain to Black people and Black culture, resulting in articles focused on "Black culture, Black excellence, and Black student experiences at The University of Alabama"[26] and advancing the magazine's mission to "educate students from all backgrounds on culturally important issues and topics."[27] *Nineteen Fifty-Six*'s content thus "highlight[s] the perspectives and experiences of Black students within the UA community." Tionna Taite Decl. ¶ 6; *see also* Matanmi Decl. ¶ 14.

For example, Plaintiff Jermaine Ball published an article in *Nineteen Fifty-Six* titled "Injustice on a Global Scale," which discussed how American individualism impacts how Black people in America view injustice around the world. Ball Decl. ¶ 18. Plaintiff Ball also wrote an article for *Nineteen Fifty-Six* titled "Redefining Family," which discusses the growing recognition of alternative familial structures; included interviews with single parents, the Chief Program Officer for an LGBTQ organization dedicated to combatting homelessness, and an assistant professor at UA; and references to Barry Jenkin's 2016 movie, *Moonlight*, to help contextualize the information through popular media. *Id.* ¶ 11.

---

[26] Boyd Decl., Ex. 7.

[27] Boyd Decl., Ex. 8.

10

Plaintiff Rihanna Pointer contributed a poem titled "Kaleidoscopic Melodies," which discussed the importance of allyship, and articles titled "Misogynoir: The Intersection of Blackness and Womanhood," "Breaking the Stigma: An Exploration of the 'Too Much' Perception for Women of Color," and "Capturing the Chaos: Gus Robinson's Photographs of the 1956 Tuscaloosa Riots." Pointer Decl. ¶¶ 7–8, 13. In Plaintiff Pointer's article "Misogynoir: The Intersection of Blackness and Womanhood" she interviewed students, a professor in the Sociology department, and two other professors with backgrounds in women studies, sociology and history to examine and discuss how Black women experience various forms of violence at the intersection of race and gender because she felt as though "misogynoir" is something that is often not discussed. *Id*. ¶ 8.

## IV.    UA's Suspension and Funding Termination of Magazines

On December 1, 2025, administrators at the University invited editors and contributors from *Alice* and *Nineteen Fifty-Six* to a meeting to inform the students that UA decided to suspend and terminate financial support for both magazines, indefinitely. Gunter Decl. ¶ 17; Matanmi Decl. ¶¶ 10–12. No editors or contributors of any other student media enterprise recognized by the MPB were informed that their student publications would be suspended and their funding terminated. Matanmi Decl. ¶ 13; Waugh Decl. ¶ 16.

UA administrators informed Plaintiffs that the University's decision stemmed from its interpretation of a non-binding memorandum from U.S. Attorney General Pam Bondi, issued on July 29, 2025 ("Memorandum" or "Bondi Memorandum"). Gunter Decl. ¶ 19; Matanmi Decl. ¶ 11; Pointer Decl. ¶ 16. The guidance does not mention or reference student publications.[28] Vice President of Student Life Steven Hood "told the staff of each magazine . . . that because the magazines target primarily specific groups, they are 'unlawful proxies,'" referencing the Bondi Memorandum.[29] *See* Gunter Decl. ¶ 19; Matanmi Decl. ¶¶ 11–12.

Plaintiff Gunter asked why the decision to suspend *Alice* and *Nineteen Fifty-Six* was not a violation of the students' First Amendment rights, and Vice President Hood responded that the problem was not the content of *Alice* and *Nineteen Fifty-Six*, but instead the magazines' audiences. Gunter Decl. ¶ 19. Plaintiff Gunter explained that, according to *Alice*'s mission statement, the magazine is for everyone and that *Alice* never excluded anyone from participating on the editorial board or contributing to the magazine, to which Vice President Hood responded that the magazine "looks like it is a magazine for women" even though he understood her concern. *Id.*

---

[28] Boyd Decl., Ex. 9.

[29] Boyd Decl., Ex. 10.

As a result of UA's decision to suspend *Alice* and *Nineteen Fifty-Six* and terminate their funding through UA Student Media Funds, Plaintiffs no longer have access to funding from the University, UA advising, UA technology and editing support, a dedicated campus space on campus, and student publication distribution privileges. *See id*. ¶¶ 18, 21; Pointer Decl. ¶ 19; Waugh Decl. ¶ 17. Plaintiffs can no longer use the magazines' respective trademarking, including the magazine names, branding, website, and social media accounts. Gunter Decl. ¶ 21; Matanmi Decl. ¶ 17.

Since UA's suspension of *Alice* and *Nineteen Fifty-Six*, Plaintiffs Caddell, Gunter, Matanmi, Pointer, and Sturdivant have attempted to produce new, independent magazines that are not affiliated with UA. Caddell Decl. ¶ 17; Gunter Decl. ¶ 24–25; Matanmi Decl. ¶ 16; Pointer Decl. ¶ 20. However, because Plaintiffs no longer have access to University funding and other resources, including the magazines' associated names and trademarks, these Plaintiffs faced and continue to face significant hurdles with producing the new, independent magazine, including the magazine's naming, staffing, branding and design, and creation of a digital and social media footprint. Caddell Decl. ¶¶ 17–18; Gunter Decl. ¶¶ 24–25; Matanmi Decl. ¶¶ 16–17; Pointer Decl. ¶ 20. The new magazines' lack of a University affiliation also significantly limits Plaintiffs' ability to solicit student contributors. Gunter Decl. ¶¶ 24–25.

13

Plaintiffs have suffered personal harm due to UA's decision to suspend *Alice* and *Nineteen Fifty-Six*. For example, Plaintiff Pointer feels the deep loss of no longer being able to contribute to a magazine that brought her "joy" and provided her with the opportunity to share her views on topics about "race, Black history, politics, and more." Pointer Decl. ¶ 21. Plaintiff Caddell described the suspension of *Alice* as "heartbreaking" because the work she had put into it "was being disregarded." Caddell Decl. ¶ 20. Plaintiff Gunter similarly experienced the suspension of *Alice* as an "extremely stressful and devastating" loss, because the magazine provided her "a great opportunity to be in community with other students who also cared deeply about highlighting the voices and experiences of marginalized students" and gave her "leadership skills and practical skills" that could be used in her future career. Gunter Decl. ¶ 28.

Plaintiff Grant Sturdivant "lost a valuable opportunity to publish [his] photography in an established, well-known publication" due to the suspension of *Nineteen Fifty-Six*. Sturdivant Decl. ¶ 18. Plaintiff Sturdivant also lost the opportunity to pursue a position on the editorial board, including running for editor-in-chief. *Id.* ¶ 19. Likewise, Plaintiff Timoni Taite planned on contributing to *Nineteen Fifty-Six* as a model and by running its social media accounts, but UA's suspension of the magazine "has taken that opportunity away" from him and denied him the "ability to continue [his] sister's legacy, but also lay the foundation for [him] to start [his] own

14

legacy by contributing to a magazine with a mission and vision that [he] want[s] to support." Declaration of Timoni Taite ("Timoni Taite Decl.") ¶¶ 8–10, 14. Plaintiff Waugh planned to interview for the positions of head photo editor or editor-in-chief of *Alice*, but due to the suspension, "[t]hese potential leadership opportunities have now been stripped away." Waugh Decl. ¶ 18. Plaintiff Caddell likewise planned to run for editor-in-chief of *Alice*, in part because the position included a stipend from UA. Caddell Decl. ¶ 8.

## ARGUMENT

It is well established "that state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). When a public university "create[s] a forum generally open for use by student groups," it "assume[s] an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Widmar v. Vincent*, 454 U.S. 263, 267 (1981); *see also Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1548 (11th Cir. 1997) ("Although the government is not required to create such forums, once it does so the Constitution constrains its power to regulate speech within the forum."). Defendants' decision to suspend *Alice* and *Nineteen Fifty-Six* and terminate their University funding violates Plaintiffs' free speech rights because the suspensions and funding terminations constitute presumptively unconstitutional viewpoint-based discrimination. "The First Amendment generally 'forbids the government to regulate

15

speech in ways that favor some viewpoints or ideas at the expense of others.'" *Moms for Liberty v. Brevard Pub. Schs.*, 118 F.4th 1324, 1331-32 (11th Cir. 2024) (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020)).

Plaintiffs are entitled to a preliminary injunction because, as set forth below, (1) they "ha[ve] a substantial likelihood of success on the merits;" (2) they "will suffer 'irreparable injury' unless an 'injunction issues;'" (3) "this 'threatened injury to the[m] … outweighs whatever damage the proposed injunction may cause the opposing part[ies];'" and (4) "the injunction would not be adverse to the public interest." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (quoting *Otto*, 981 F.3d at 860).

## I.   Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their First Amendment Claim.

### A.   Defendants' censorship of the viewpoints expressed in *Alice* and *Nineteen Fifty-Six* is presumptively unconstitutional.

A university, acting as an instrumentality of the State, "may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828; *see also Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). Content-based regulations on speech are presumptively invalid. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992) (noting that "speech can,

consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)" but that does not render "categories of speech entirely invisible to the Constitution"). When the government targets not the subject, "but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. Accordingly, viewpoint-based discrimination is one of the most "egregious types of First Amendment violations," and is "presumptively unconstitutional." *Id*. at 829-830 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279 (11th Cir. 2004); *Moms for Liberty v. Brevard Pub. Schs.*, 118 F.4th 1324, 1332 (11th Cir. 2024).

      **B.**    ***Rosenberger* holds that universities may not open a public forum for expression of student viewpoints and selectively silence the expression of disfavored viewpoints.**

The Court's decision in *Rosenberger* is particularly instructive here. In *Rosenberger*, several undergraduate students at the University of Virginia established a magazine, *Wide Awake Productions*, "to publish a magazine of philosophical and religious expression," "facilitate discussion which fosters an atmosphere of sensitivity to and tolerance of Christian viewpoints," and "[] provide a unifying focus for Christians of multicultural backgrounds." 515 U.S. 819, 825-26 (1995). From

publication of the first issue of *Wide Awake Productions*, "[t]he paper's Christian viewpoint was evident." *Id.* at 826. Shortly after the magazine was established, it acquired status as a "Contracted Independent Organization" ("CIO")[30] from the university, allowing *Wide Awake Productions* to submit bills from its outside contractors for payment by the "Student Activities Fund" ("SAF"). *Id.* at 824-25. The guidelines governing the SAF allowed for "student news, information, opinion, entertainment, or academic communications media groups" to submit disbursement requests. *Id.* at 824.

After attaining CIO status, *Wide Awake Productions* requested the SAF to pay its printer, but the request was denied on the grounds that the magazine was a "religious activity" within the meanings of the guidelines, which prohibited funding for activities that "primarily promote[] or manifest[] a particular belief in or about a deity or an ultimate reality." *Id*. at 825. Finding that the SAF served as a limited public forum, the *Rosenberger* Court held that the university could enforce restrictions on speech that were "reasonable in light of the purpose served by the forum;" however, "[h]aving offered to pay the third-party contractors on behalf of

---

[30] To qualify as a CIO, certain procedural requirements must be met including, "fil[ing] its constitution with the University; . . . pledg[ing] not to discriminate in its membership; and [] includ[ing] in dealings with third parties and in all written materials a disclaimer, stating that the CIO is independent of the University and that the University is not responsible for the CIO." *Id*. at 823. As a CIO, the group enjoyed access to the university's "facilities, including meeting rooms and computers." *Id*.

18

private speakers who convey their own messages, the University may not silence the expression of selected viewpoints." *Id.* at 829, 835. Put simply, this rule in *Rosenberger* is a simple extension of the precept that freedom of speech and expression may not be infringed by denying a privilege made available to others within the same forum.

> **C.**    **Defendants established a public forum for expression by creating the OSM and MPB and distributing UA Student Media Funds and then unconstitutionally silenced *Alice* and *Nineteen Fifty-Six* based on the viewpoints espoused in the magazines.**

Like the university in *Rosenberger*, Defendants' Media Planning Charter explicitly states that Defendants established a public forum for student media enterprises at the University by creating the OSM and MPB and distributing UA Student Media Funds, thereby "opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." *McDonough v. Garcia*, 116 F.4th 1319, 1328 (11th Cir. 2024) (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010)); *see also* Student Media, Media Planning Board Charter, https://studentmedia.sl.ua.edu/planning-board/media-planning-board-charter/ ("In providing general oversight for the student media under its purview, the MPB promotes the highest standards of journalism and communication; safeguards their interests, including their financial stability and editorial independence; and ensures that those media are responsive to the needs and concerns of the University community."). Prior to Defendants' suspension

19

and funding termination of *Alice* and *Nineteen Fifty-Six*, *Alice* and *Nineteen Fifty-Six* received UA Student Media Funds, as well as support and equipment from the OSM. *See supra* Statement of Facts, Part II. The University continues to provide UA Student Media Funds, as well as support and equipment from the OSM to other student media enterprises, including *The Crimson White*, *Marr's Field Journal*, and *Southern Historian*. Matanmi Decl. ¶ 13; Gunter Decl. ¶ 20; Waugh Decl. ¶ 16.

Here, as in *Rosenberger*, "[t]he [magazines'] [race and sex-specific] viewpoint[s] w[ere] evident," *Rosenberger*, 515 U.S. at 826, from their inception. While participation in *Alice* was open to all students regardless of race and sex, content published in *Alice* reflected the magazine's mission and the editorial perspectives of students seeking to highlight and amplify the views and experiences of women and people who do not identify as cisgender men about issues related to gender, sexuality, and various topics. Likewise, while participation in *Nineteen Fifty-Six* was open to all students regardless of race and sex, content published in *Nineteen Fifty-Six* typically reflected the magazine's mission and the editorial perspectives of students interested in the views and experiences of Black people, Black culture, race, and an array of other related topics. It is, in part, these viewpoints communicated through the magazines' editorial choices that the University found objectionable. *Cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 734–40 (2024) (choice of content can communicate a viewpoint protected by the First Amendment).

UA administrators' statements that they suspended *Alice and Nineteen Fifty-Six* because of the magazines' audience not the content assumes that those two things are separable, but they are not. The editorial perspectives of these magazines come from the viewpoints of students interested in the mission of each magazine, and it is because of these viewpoints that readers interact with the content of the magazines. In other words, the audiences of *Alice* and *Nineteen Fifty-Six* derive from the viewpoints of the magazines' editors and contributors; ergo, the University's closure of the magazines because of their audiences necessarily entail the University's closure of the magazines because of their viewpoints.

Moreover, there is no factual basis for Defendants to assume that the editorial perspectives in *Alice* or *Nineteen Fifty-Six* only appeal to women and Black students. That is the equivalent of assuming that only Black audiences read the works of Langston Hughes or listen to Louis Armstrong, or that only women read Sylvia Plath or listen to Linda Ronstadt. In fact, both *Alice* and *Nineteen Fifty-Six* seek to share their editorial perspectives with the entirety of the campus community. Ball Decl. ¶¶ 26–27; Waugh Decl. ¶ 13; Matanmi Decl. ¶¶ 14–15; Pointer Decl. ¶¶ 16–21; Caddell Decl. ¶ 15; Gunter Decl. ¶¶ 14–15.

In suspending *Alice* and *Nineteen Fifty-Six*—and not, for example, *The Crimson White* or *Marr's Field Journal*—UA engaged in the exact type of viewpoint discrimination that the Court in *Rosenberger* deemed unconstitutional. *Rosenberger*,

21

515 U.S. at 819. Consider the following slight modification of the holding in *Rosenberger*: "it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about [race and/or sex] . . . except those dealing with the subject matter from a [Black person's and/or woman's] standpoint." *Rosenberger*, 515 U.S. at 830. By Defendants' logic, the magazine in *Rosenberger* would have been just as much an "unlawful proxy"[31] for religious discrimination as *Alice* and *Nineteen Fifty-Six* were for sex and race. What's more, the University "cannot indulge in the facile assumption that one can forbid particular" audiences "without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular" views espoused by members of a particular race and/or sex "as a convenient guise for banning the expression of unpopular views." *Cohen v. Cal.*, 403 U.S. 15, 26 (1971).

Although the MPB is a public forum of the University's own creation, Defendants failed to "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. Because the University's suspension and funding

---

[31] Any argument that UA's viewpoint discrimination is justified to comply with the nonbinding guidance in the Bondi Memorandum is unavailing. The Memorandum does not mention student publications nor suggest that student publications may constitute or run the risk of constituting "unlawful proxies." Regardless, this nonbinding guidance does not accurately summarize the law and does not somehow supersede Defendants' obligations to not violate the First Amendment rights of Plaintiffs.

termination of *Alice* and *Nineteen Fifty-Six* constitutes viewpoint-based discrimination, Plaintiffs have a substantial likelihood of success on the merits of their claim.

## II.    Absent a Preliminary Injunction, Plaintiffs Will Continue to Suffer Irreparable Injury.

"It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983), certified question answered, 450 So. 2d 224 (Fla. 1984) (citing *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B 1981)). "[B]ecause the injury here is direct rather than incidental, the remedy required is an injunction." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024).

Absent an injunction, Plaintiffs will continue to suffer irreparable harm. The University's viewpoint-based suspensions of both magazines and restrictions on their funding have inevitably resulted in the suppression of ideas and views that are evidently disfavored. *See* Pointer Decl. ¶¶ 20–21; Caddell Decl. ¶¶ 18–19; Gunter Decl. ¶¶ 25, 28; Matanmi Decl ¶ 17. Unlike other media enterprises under the jurisdiction of the MPB, *Alice* and *Nineteen Fifty-Six* are the only magazines that have been denied the opportunity to participate in a forum created by the University that is open for use to student media enterprises. *See* Matanmi Decl. ¶ 13; Waugh Decl. ¶ 16; Gunter Decl. ¶ 20. Moreover, the University's offer to create another student magazine does not address Plaintiffs' ongoing harms because UA did not assure

23

Plaintiffs that their viewpoints and editorial perspectives, as expressed in *Alice* and *Nineteen Fifty-Six* and pursuant to the magazines' missions, are welcomed and included in the proposed new publication. *See* Matanmi Decl. ¶ 19; Waugh Decl. ¶ 22.

Moreover, because of UA's decision to suspend *Alice* and *Nineteen Fifty-Six*, Plaintiffs no longer have access to equipment, faculty advisors, office space, and their respective trademarks. *See* Gunter Decl. ¶ 21; Pointer Decl. ¶ 19; Waugh Decl. ¶ 17. This resulted in *Alice* and *Nineteen Fifty-Six* "being denied the right to disseminate . . . the information that would have been published in the [magazines]." *Reineke v. Cobb Cnty. Sch. Dist.*, 484 F. Supp. 1252, 1262 (N.D. Ga. 1980) (granting plaintiff's preliminary injunction, concluding in part that "irreparable injury ha[d] been adequately demonstrated" when students' monthly newspaper was suspended).

Finally, UA's suspension of *Nineteen Fifty-Six*, specifically, has resulted in stigmatic harm to the students. Ball Decl. ¶ 27 ("*Nineteen Fifty-Six* was the only publication on campus that spoke directly to the experiences of Black students—Black people—and gave voice to the concerns and triumphs of these communities"); Matanmi Decl. ¶ 16 ("There has also been a significant impact on our sense of community and belonging since it has felt as if UA just erased *Nineteen Fifty-Six* from UA's history."); Timoni Taite Decl. ¶ 13 (The "decision to suspend *Nineteen Fifty-Six* feels targeted to me. I feel as though UA suspended [the magazine] because [it] focused on sharing and amplifying the perspectives of Black students

24

about life on campus."). The attachment of the language "unlawful proxy" to the magazine, has engendered backlash to the magazines' existence, where previously there was praise. Gunter Decl. ¶ 28 ("Since the suspension, other members of *Alice* and myself have been called "DEI hires" because of UA's justification for suspending the magazines.").

### III.   The Balance of Equities Favors Granting a Preliminary Injunction.

The ongoing injury to Plaintiffs' First Amendment rights outweighs any hypothetical damage an injunction would cause UA. The constitutional violations are ongoing and are *per se* irreparable. Moreover, UA's suspension and funding termination of *Alice* and *Nineteen Fifty-Six* fail to remedy any actual or legitimate harms.

On the other hand, UA does not risk any irreparable damage from a preliminary injunction because the University "has no legitimate interest in enforcing an unconstitutional" decision. *KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261, 1272 (11th Cir. 2006).[32] Accordingly, the balance of equities tips with full weight in Plaintiffs' favor.

---

[32] Plaintiffs request that the Court waive the bond requirement under Rule 65(c) of the Federal Rules of Civil Procedure. While courts in the Eleventh Circuit generally require a bond pursuant to Rule 65(c) before issuing injunctive relief, it is within the Court's discretion to waive this requirement. *See Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130 (11th Cir. 2018). Irreparable harm to Plaintiffs' constitutional rights is ongoing, and Defendants cannot show an injunction would cause them any injury necessitating a bond. Therefore, waiver is warranted.

## IV.    A Preliminary Injunction Would Serve the Public Interest.

Courts in the Eleventh Circuit have consistently recognized that "it is always in the public interest to protect First Amendment liberties." *Id.* at 1272. More broadly, courts recognize "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). Here, these principles have particular importance because "[v]ital First Amendment speech principles are at stake." *Rosenberger*, 515 U.S. at 835.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for a preliminary injunction and enjoin Defendants from suspending *Alice* and *Nineteen Fifty-Six* and terminating their University funding.

March 31, 2026

Avatara A. Smith-Carrington[*]
    acarrington@naacpldf.org
Antonio L. Ingram II[*]
    aingram@naacpldf.org
Emahunn Campbell[*]
    ecampbell@naacpldf.org
Mide Odunsi[*]
    modunsi@naacpldf.org
Attorneys for Plaintiffs
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300

/s/ **Diego A. Soto**
Michael J. Tafelski[†]
    michael.tafelski@splcenter.org
Sam Boyd[*]
    sam.boyd@splcenter.org
Brock Boone
    brock.boone@splcenter.org
Diego A. Soto
    AL Bar No. 3626Y61S
    diego.soto@splcenter.org
Arielle Hudson[*]
    arielle.hudson@splcenter.org
Attorneys for Plaintiffs
SOUTHERN POVERTY
    LAW CENTER
400 Washington Avenue

Alison Mollman
Attorney for Plaintiffs
ACLU OF ALABAMA
PO Box 6179
Montgomery, AL 36106
(510) 909-8908
amollman@aclualabama.org

Ashley Gammell[*]
Ai-Li Chiong-Martinson[*]
Attorneys for Plaintiffs
ARNOLD & PORTER KAY SCHOLER
1420 5th Avenue, Suite 1400
Seattle, WA 98101
(206) 288-0110
ashley.gammell@arnoldporter.com
ai-li.chiong-martinson@arnoldporter.com

Montgomery, AL 36104
(334) 956-8200

Daniel A. Cantor[*]
Attorney for Plaintiffs
ARNOLD & PORTER KAY SCHOLER
601 Massachusetts Ave, NW
Washington, DC 20001-3743
(202) 942-5000
daniel.cantor@arnoldporter.com

Allyson Myers[*]
Attorney for Plaintiffs
ARNOLD & PORTER KAY SCHOLER
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
(213) 243-4000
ally.myers@arnoldporter.com

[*] *Pro hac vice* application pending
[†] Admitted in Alabama; application for admission to the Northern District of Alabama forthcoming

27