# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

RIHANNA POINTER, GRANT
STURDIVANT, TIMONI TAITE,
JALEEL MATANMI, JERMAINE
BALL, SARA BETH CADDELL,
GABRIELLE GUNTER, and EMMY
WAUGH,

  Plaintiffs,

vs.

SCOTT PHELPS in his official capacity
as President Pro Tempore University of
The Board of Trustees of The University
of Alabama, MIKE BROCK, KAREN
BROOKS, MYLA E. CALHOUN,
ANGUS R. COOPER III, RONALD
GRAY, JEFF GRONBERG,
O.B. GRAYSON HALL, JR.,
BARBARA HUMPHREY, W. DAVIS
MALONE III, EVELYN VANSANT
MAULDIN, HARRIS MORRISSETTE,
J. STEVEN ROY, KENNETH SIMON,
KENNETH VANDERVOORT, and KAY
IVEY in their official capacities as
members of The Board of Trustees of
The University of Alabama

  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 7:26-cv-00476-EGL

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

3582844.1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ..........................................................................................1

FACTUAL BACKGROUND ...........................................................................3

   I.    The University's Office of Student Media and Media Planning Board. ..3

   II.   *Alice* and *Nineteen Fifty-Six*. ...........................................................6

   III.   The University's Concerns About *Alice* and *Nineteen Fifty-Six*. ...........8

   IV.   Suspension of *Alice* and *Nineteen Fifty-Six* and Development of a New Feature Magazine. .................................................................................12

ARGUMENT ...............................................................................................15

   I.    Plaintiffs Cannot Show a Substantial Likelihood of Success on the Merits. 17

      A.   *Alice* and *Nineteen Fifty-Six* Were Not Suspended Because of the Viewpoints Expressed in the Magazines or by Their Contributors. ..........17

      B.   *Rosenberger* Does Not Support Plaintiffs' Claims. ...........................23

   II.   Plaintiffs' Delay in Seeking a Preliminary Injunction Demonstrates the Lack of an Imminent Irreparable Harm. ......................................................25

CONCLUSION .............................................................................................26

3582844.1

# TABLE OF AUTHORITIES

**Cases**

*Benisek v. Lamone*, 585 U.S. 155 (2018)..................................................................25

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) ...................................16

*Huggins v. Sch. Dist. of Manatee Cty.*, 151 F.4th 1268 (11th Cir. 2025).......... 16, 17

*Keister v. Bell*, 879 F.3d 1282 (11th Cir. 2018) ......................................................16

*McDonough v. Garcia*, 116 F.4th 1319 (11th Cir. 2024) .........................................16

*Miller v. Johnson*, 515 U.S. 900 (1995)............................................................ 18, 19

*Naples Pride, Inc. v. City of Naples*, No. 25-11756, 2025 U.S. App. LEXIS 17858
(11th Cir. June 6, 2025) ...................................................................... 18, 26

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) 17, 23, 24

*Scott v. Roberts*, 612 F.3d 1279 (11th Cir. 2010) ....................................................15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600
U.S. 181 (2023) ................................................................ 8, 18, 19

*Vidal v. Elster*, 602 U.S. 286 (2024) ......................................................................17

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008)......................................................... 15, 25

*Wreal, Ltd. Liab. Co. v. Amazon.com*, 840 F.3d 1244 (11th Cir. 2016)...... 16, 25, 26

*Yoseph v. Fla. Dep't of Corr.,* No. 25-10113, 2025 U.S. App. LEXIS 20718 (11th Cir.
Aug. 14, 2025)..........................................................................................26

**Statutes**

20 U.S.C. § 1681 ......................................................................................................11

42 U.S.C. § 2000d......................................................................................................9

42 U.S.C. § 2000e ....................................................................................................11

3582844.1

iv

## Constitutional Provisions

U.S. CONST. amend. XIV, § 1 ................................................................................9

3582844.1

**INTRODUCTION**

Plaintiffs' brief in support of their Motion for Preliminary Injunction is based on the University of Alabama's decision to suspend two magazines, *Alice* and *Nineteen Fifty-Six*, which operated within the University's Office of Student Media and under the jurisdiction of the University's Media Planning Board, and to redirect University resources to create a new feature magazine. Plaintiffs claim the publications were suspended because UA administrators "disfavor the magazines' editorial perspectives, as well as the perspectives of student contributors, related to gender and race." In reality, the University chose to suspend *Alice* and *Nineteen Fifty-Six* in order to ensure all students felt welcome to participate in programs that receive funding from the Office of Student Media, particularly in light of the Department of Justice's *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination*.

It is undisputed that *Alice* held itself out as a magazine for women and *Nineteen Fifty-Six* held itself out as a magazine for Black students. It is also undisputed that both magazines were official student publications published by the University, were hosted on University-owned webpages, were staffed by University employees, and were held out to students as University programming. In other words, they undoubtedly bore the imprimatur of the University. Because these magazines were dedicated to publishing content "by and for" members of a single

1

race or sex, the University's concerns about complying with the Department of Justice's Guidance were legitimate.

Equally apparent is that the suspensions were not based on the University's "disfavor" of viewpoints published in the magazines or held by their contributors. It is undisputed that the University never exercised editorial control over the magazines or censored any content while they were in publication. The contributors to *Alice* and *Nineteen Fifty-Six* are free to publish their viewpoints in other University-supported publications, and there is no practice or policy prohibiting them from doing so. Indeed, *The Crimson White* continues to print articles and opinion pieces espousing many of the same topics Plaintiffs claim the University disfavors. Further, the University's ongoing efforts to develop a new magazine featuring content from a wide variety of perspectives demonstrates the University's aim is not to silence any viewpoints but to ensure that all students feel welcome to contribute to and engage with the publications housed within the University's Office of Student Media. This is particularly true given the fact that the editor-in-chief selected for the new magazine was previously a paid staff member for one of the suspended magazines.

The funding and resources at issue in this case are a limited public forum, which means the Plaintiffs must prove the reason for the suspension was viewpoint discriminatory. Plaintiffs, however, have put forward no evidence that the

2

University's actions were motivated by Plaintiffs' viewpoints. In fact, Plaintiffs have not even identified the specific viewpoints the University is supposed to have discriminated against. As a result, Plaintiffs' Motion for Preliminary Injunction is due to be denied.

## FACTUAL BACKGROUND

### I.    The University's Office of Student Media and Media Planning Board.

The University's Office of Student Media ("OSM") is housed within the Division of Student Life. (Affidavit of Steven Hood at ¶ 5, attached hereto as Exhibit 1). OSM provides educational and programming opportunities for UA students, and is home to several student media enterprises, including *Bama Life Newsletter*, *Black Warrior Review*, *The Crimson White*, *Marr's Field Journal*, *WVUA-FM*, and *Southern Historian*. (Affidavit of Jessie Jones at ¶ 5, attached hereto as Exhibit 2). These publications operate within OSM, and a majority of them fall under the purview of the Media Planning Board ("MPB"), a standing committee of the University of Alabama whose "chief responsibility" is "to provide oversight, guidance, and support to student media at The University of Alabama" and is tasked with ensuring the media enterprises under its purview "are responsive to the needs and concerns of the University community." (Ex. 2, Exhibit A § II). MPB is governed by the Media Planning Board Charter. (Ex. 2 at ¶ 9).

3582844.1

Among other things, MPB is tasked with "oversee[ing] the operation of all student media under its jurisdiction to ensure that the Vision and Mission of UA Student Media are fulfilled," "promoting responsible student media practices in the enterprises under its purview," "consider[ing] and approv[ing] general operational policies and procedures for the student media," "establish[ing] and monitor[ing] uniform financial procedures for media groups," "requir[ing] all media to develop and maintain operation manuals that provide a set of standards and a level of continuity year to year," and "tak[ing] disciplinary action against…student leaders appointed through the MPB for violation of MPB policies or for not properly performing duties." (*Id.*, Exhibit A at §§ II, VII). MPB is not permitted to "engage in censorship, prior restraint, or any other action concerning content which would be a violation of the enterprises' First Amendment rights," "order the publication of specific information," or "consider for affiliation any student media enterprise with an espoused ideological, sectarian, religious, or partisan political editorial policy." (*Id.*, Ex. B at § VIII).

Student publications at UA do not receive funding and resources from OSM or MPB as a matter of course. (Ex. 2 at ¶ 10). MPB's affiliation decisions are subject to review by UA's Vice President for Student Life. (Ex. 2 at Ex. A at § XII(D)(8)). Concurrent with MPB's power to affiliate with selected media publications is its ability to "discontinu[e]…affiliation with any student media under its jurisdiction."

4

(*Id.* at § VII(5)). The MPB Charter "recognizes that in the future new student media needs may appear" and "encourages the evolution of media to meet these needs." (*Id.* at § XII).

Student media enterprises within the MPB's jurisdiction are part of the slate of programs and learning opportunities the University makes available to its students. (Ex. 1 at ¶ 14); *see Media Opportunities*, THE UNIV. OF ALA., https://studentmedia.sl.ua.edu/media-opportunities/ (last visited Apr. 12, 2026). While "daily management of student media is the responsibility of the students appointed to relevant positions," publications within MPB's jurisdiction are "supervised as necessary and appropriate by the full-time professional staff of UA Student Media," and "MPB has the responsibility to oversee the effective and efficient management of the media under its purview." (Ex. 2 at Ex. A at § II). MPB "appoint[s]…the student leader[s] of all media enterprises under its jurisdiction," and is required to discipline or dismiss appointed student leaders who fall below the MPB's standards. (*Id.* at § IX). MPB's "Administration Committee" is responsible for "the oversight of short- and long-range planning, awards recommendations, policy administration in addition to management of the student media enterprises under the aegis of the MPB," while the MPB's "Evaluation Committee" is responsible for "hearing media reports, evaluating progress toward set goals and assessing the performance of the student leaders appointed by the board." (*Id.* at §

5

X(c)). The rights and websites associated with each student media enterprise housed within MPB are owned by the University. (Ex. 2 at ¶ 22); (Doc. 26-1 at 11 ¶ 40). Finally, the paid staff members of each student media enterprise are employed and paid by the University. (Ex. 2 at ¶ 21).

## II.    *Alice* and *Nineteen Fifty-Six*.

*Alice* is a student magazine that publishes content focusing on "issues about gender and sexuality as they pertain to women and people who do not identify as cisgender men." (Doc. 26-1 at 12). In its mission statement, *Alice* describes itself as "a publication by and for college women," and "the next generation women's magazine." (Doc. 26-15 at 4). *Alice* asserts it is "the brainchild of…faculty and students who decided we have enough material about Big Al," and states that "we do focus on college women." *Id.* In 2015, *Alice* was established as a student media enterprise housed within OSM and under the purview of MPB. (Ex. 2 at ¶ 15). Since then, *Alice* has received funds from OSM each semester to print its magazine, and its paid staff have been employed by the University. (Ex. 2 at ¶¶ 15-19).

*Nineteen Fifty-Six* is a student magazine focused on "Black culture, Black excellence, and Black student experiences at the University of Alabama." (Doc. 26-1 at 13-14); (Doc. 26-23 at 2). *Nineteen Fifty-Six* describes itself as "a Black student-led magazine that amplifies Black voices within the University of Alabama's community." (Doc. 26-19 at 4). One of its founders has submitted that "the magazine

6

was built to highlight Black culture and the experiences of Black people." (Doc. 26-2 at 2 ¶ 6). The introduction to the most recent issue begins with the words "Dear Black Students." *Id.* MPB accepted a student proposal for *Nineteen Fifty-Six* to become a student media enterprise in 2020. (Ex. 2 at ¶ 16). The proposal described the *Nineteen Fifty-Six* as a "magazine created for black students." (Ex. 2, Ex. B). *Nineteen Fifty-Six* has received funds from OSM each semester to print its magazine, and its paid staff have been employed and paid by the University. (Ex. 2 at ¶¶ 17-19).

*Alice* and *Nineteen Fifty-Six* are the only two magazines managed by MPB. (*Id.* at ¶ 17). Each year, the MPB appoints an editor-in-chief for both magazines based on a slate of student applications. (*Id.* at ¶ 18). The editors-in-chief recruit the remaining members of the student staff for both magazines. Paid staff members are employed by the University and paid for their work. (*Id.* at ¶ 19). (Doc. 26-10 at 4 ¶ 13). Since at least the 2024-2025 school year, it appears that the paid staff members of *Alice* have consisted entirely of female students and the paid staff members of *Nineteen Fifty-Six* have consisted entirely of Black students. (Ex. 1 at ¶ 28).

Neither the University, OSM, nor MPB ever exerted editorial control over the content published in *Alice* or *Nineteen Fifty-Six* when they were in publication. (Ex. 2 at ¶ 22); (Doc. 26-1) ("UA did not have editorial oversight with regard to the content of *Alice* and *Nineteen Fifty-Six*, including, but not limited to, the selection

7

3582844.1

of topics, photography, or the design for the magazines."); (Doc. 26-10 at 4 ¶ 16) ("UA has no control over the content that is published in *Alice*.").

### III.    The University's Concerns About *Alice* and *Nineteen Fifty-Six*.

In recent years, educational institutions have received scrutiny from the Supreme Court and federal law enforcement agencies for practices and programming that distinguish students based on protected characteristics. Specifically, in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"), the Supreme Court held that race-conscious college admissions practices violate the Equal Protection Clause of the Fourteenth Amendment. While that case involved admissions, it made several things clear: (1) the only "compelling interests" that can justify race-based government action in any context are "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and "avoiding imminent and serious risks to human safety in prisons, such as a race riot," *Id.* at 207; (2) universities should abandon the "offensive and demeaning assumption that [students] of a particular race, because of their race, think alike," *Id.* at 220-21; and (3) the Supreme Court believes each student should "be treated based on his or her experiences as an individual—not on the basis of race," and that "[m]any universities have for too long done just the opposite." *Id.* at 231.

8

In February 2025, the Department of Education's Office for Civil Rights published a "Dear Colleague" letter informing educational institutions of the Department's interpretation of Title VI of the Civil Rights Act of 1964[1] and the Fourteenth Amendment's Equal Protection Clause[2] following *SFFA*.[3] The letter states, among other things, that *SFFA* "applies more broadly" than just to admissions and that "educational institutions may neither separate or segregate students based on race, ***nor distribute benefits*** or burdens based on race," and warns that "[i]nstitutions that fail to comply" with these interpretations of federal law "face potential loss of federal funding." *Id.* (emphasis added).

Similarly, in July 2025, the Department of Justice issued a memorandum titled *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination*. (Doc. 26-25). The memo sets forth several "non-binding" best practices "to help entities comply with federal antidiscrimination laws and avoid legal pitfalls," including the following:

---

[1] Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

[2] The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

[3] "*Dear Colleague" Letter*, U.S. DEP'T OF EDUC. (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

9

1. Recipients of federal funds "must ensure that their programs and activities comply with federal law and do not discriminate on the basis of race . . . sex . . . or other protected characteristics—*no matter the program's labels, objectives, or intentions*. *Id.* at 1 (emphasis added).

2. "Using race, sex, or other protected characteristics for *employment, program participation, resource allocation,* or other similar *activities, opportunities*, or benefits, is unlawful." *Id.* at 2 (emphasis added).

3. "Preferential treatment occurs when a federally funded entity provides opportunities, benefits, or advantages to individuals or groups based on protected characteristics . . . *including such practices portrayed as 'preferential' to certain groups*." *Id.* at 4 (emphasis added).

4. Segregation based on protected characteristics occurs when a federally funded entity organizes programs, activities, or resources . . . in a way that separates or restricts access based on race, sex, or other protected characteristics." *Id.* at 5.

5. "A college receiving federal funds" engages in unlawful practices by "designat[ing] a 'BIPOC-only study lounge,' facially discouraging access by students of other races. *Even if access is technically open to all, the identity-based focus creates a perception of segregation and may foster a hostile environment*. This extends to any resource allocation . . . that segregates access based on protected characteristics." *Id.* at 6

6. "Unlawful use of protected characteristics occurs when a federally funded entity or program *considers race, sex, or any other protected trait as a basis for selecting candidates for employment* . . . *or program participation*. . . . This includes policies that explicitly mandate representation of specific groups in candidate pools or implicitly prioritize protected characteristics

10

through selection criteria, such as 'diverse slate' requirements." *Id.* at 6-7 (emphasis added).

These recommendations were made to assist in compliance with Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act of 1964,[4] Title IX of the Education Amendments of 1972,[5] and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 3.

During the fall 2025 semester, the University became concerned that *Alice* and *Nineteen Fifty-Six* limited participation in OSM funded programs, and might not comply with the Department of Justice's Guidance. (Ex. 1 at ¶¶ 26-27). Specifically, the University was concerned that the only two student magazines under its purview were explicitly "by and for" students of only one race or sex. (*Id.* ¶ 28). Even though these publications were technically available to all students and had non-discrimination policies in place, the University wanted to ensure that all students felt welcome to participate in these programs that receive funding from OSM, particularly in light of the Department of Justice's Guidance. (*Id.* at ¶¶ 27, 28).

---

[4] Title VII provides it is unlawful for an employer to "hire or to discharge any individual" or "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment" because of the individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1)-(2).

[5] Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

11

## IV.    Suspension of *Alice* and *Nineteen Fifty-Six* and Development of a New Feature Magazine.

In light of the concerns raised by the University's continued operation of *Alice* and *Nineteen Fifty-Six*, the University decided to suspend both publications indefinitely and develop a new feature magazine that provides similar opportunities to a broad range of students on campus. (Ex. 1 at ¶ 30).

On December 1, 2025, University administrators convened a meeting with the editors and contributors of *Alice* and *Nineteen Fifty-Six* and informed them that the University was suspending both magazines. (*Id.* at ¶ 31); (Doc. 26-10 at 5-6 ¶¶18-19). According to Plaintiffs, Dr. Steven Hood, Vice President for Student Life, told students at the meeting that "the problem was not the content of *Alice* and *Nineteen Fifty-Six*, but instead the magazines' audiences." (Doc. 26-1 at 16). Dr. Hood did not state that the University has any problem with the individual members of the magazines' audiences; rather, Dr. Hood explained the University's concerns that *Alice* and *Nineteen Fifty-Six*, as University-sponsored publications, raised federal compliance concerns. (Ex. 1 at ¶¶ 31-34). During the same meeting, Dr. Hood informed the editors and contributors of *Alice* and *Nineteen Fifty-Six* that the University "would be creating a new magazine that is for everyone and all encompassing," (Doc. 26-10 at 5 ¶ 18), and that the University welcomed their input and participation in developing the new magazine. (Ex. 1 at ¶ 35).

12

Later that day, in a statement to the *Crimson White*, a University spokesperson stated that the University's decision was to "ensure all members of our community feel welcome to participate in programs that receive funding from the Office of Student Media." Maven Navarro & Jacob Ritondo, *University Suspends Alice, Nineteen Fifty-Six Student Magazines*, THE CRIMSON WHITE (Dec. 1, 2025).[6] The following day, a spokesperson for the University stated in another article:

> The University remains committed to supporting every member of our community and advancing our goals to welcome, serve, and help all succeed. In doing so, we must also comply with our legal obligations. This requires us to ensure all members of our community feel welcome to participate in programs that receive University funding from the Office of Student Media.

Maven Navarro, *University looks to create new magazine following suspension of Alice, Nineteen Fifty-Six*, THE CRIMSON WHITE (Dec. 2, 2025).[7]

Two weeks after the meeting, Jessie Jones, the Director of OSM, personally reached out to the paid staffs of both *Alice* and *Nineteen Fifty-Six*, welcoming their involvement and input in developing a new feature magazine for MPB and informing them that they would continue to receive their stipends for the 2025-2026 school year. (Ex. 2 at ¶ 24); (Doc. 26-10 at 6 ¶ 21); (Doc. 1 at 21 ¶ 86).

---

[6] https://thecrimsonwhite.com/125358/news/university-suspends-alice-nineteen-fifty-six-student-magazines/ (last visited Apr. 9, 2026)

[7] https://thecrimsonwhite.com/125370/news/university-looks-to-create-new-magazine-following-suspension-of-alice-nineteen-fifty-six/ (last visited Apr. 9, 2026).

3582844.1

OSM and a group of interested students are currently developing a new feature magazine, which hopes to publish its first issue in Fall 2026. (Ex. 2 at ¶ 25). Since December 2025, OSM has hosted at least five separate events welcoming student input and participation to brainstorm concepts for the new magazine. (*Id.* at ¶¶ 26-27). OSM also published a survey seeking student input for the new magazine. (*Id.* at ¶ 28). After receiving student input from the survey and brainstorming sessions, OSM hosted a workshop with a group of interested students on March 29, 2026, to continue developing the new magazine's name, mission, and content areas. (*Id.* at ¶ 29). Based on this student input, the new magazine will likely be focused on lifestyle, art, and social content. (*Id.* at ¶ 30). As currently planned, the magazine will be student-forward rather than institutionally focused, featuring stories highlighting voices from all backgrounds and perspectives and everyday people with compelling stories. (*Id.*). The geographic focus will primarily be the Tuscaloosa community, but the magazine will feature stories encompassing the state and region when deemed appropriate by the student editor-in-chief. (*Id.*).[8]

The University will not exercise editorial control over the viewpoints expressed in the new magazine. (*Id.* at ¶ 31). Any content that could have been published in future editions of *Alice* and *Nineteen Fifty-Six* will be eligible for

---

[8] This description is based on the current vision for the magazine, which is still in development and is subject to change.

14

publication in the new magazine, subject to the discretion of the future magazine's student editor-in-chief. (*Id.* at ¶ 32). Indeed, a former member of the paid staff for one of the suspended magazines has been selected as the editor-in-chief for the new magazine. (*Id.* at ¶ 33). The University hopes the new magazine will encourage engagement and participation from all members of the student community regardless of race, sex, or viewpoint. (*Id.* at ¶ 33). The University hopes that more former contributors to *Alice* and *Nineteen Fifty-Six* will seek to publish content in the new feature magazine. (*Id.*).

## ARGUMENT

Plaintiffs allege the closure of *Alice* and *Nineteen Fifty-Six* impermissibly discriminated against their viewpoints in violation of their rights under the First Amendment. (Doc. 1 at 27-29). They filed a Motion for Preliminary Injunction (Doc. 26) and a Brief in support (Doc. 26-1), asking the Court to preliminarily enjoin the University from suspending *Alice* and *Nineteen Fifty-Six*. A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Rather, "[a] party seeking a preliminary injunction bears the burden of establishing its entitlement to relief." *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). To obtain a preliminary injunction, Plaintiffs must show: (1) they have a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to Plaintiffs outweighs

15

whatever damage the proposed injunction may cause Defendants; and (4) if issued, the injunction would not be adverse to the public interest. *Wreal, Ltd. Liab. Co. v. Amazon.com*, 840 F.3d 1244, 1247 (11th Cir. 2016).

Plaintiffs concede MPB funding and resources are a limited public forum as it is only available "for certain groups or for the discussion of certain topics." *McDonough v. Garcia*, 116 F.4th 1319, 1324 (11th Cir. 2024).[9] In a limited public forum, "the government's restrictions on speech 'must not discriminate against speech on the basis of viewpoint' and 'must be reasonable in light of the purpose served by the forum.'" *Id.* at 1329 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001)). Here, Plaintiffs do not argue that the University's suspension of *Alice* and *Nineteen Fifty-Six* was unreasonable. Plaintiffs only argue the suspensions were viewpoint discriminatory. As a result, the dispositive question is whether the University "based [its] conduct on the plaintiff[s'] viewpoint." *Huggins v. Sch. Dist. of Manatee Cty.*, 151 F.4th 1268, 1284 (11th Cir. 2025); *see also Keister v. Bell*, 879 F.3d 1282, 1288 n.4 (11th Cir. 2018) ("[B]ecause Mr. Keister did not raise [reasonableness] in his initial brief, we have no occasion to address it here."); *Huggins*, 151 F.4th at 1284 n.12 (11th Cir. 2025) ("We don't analyze

---

[9] Plaintiffs' Brief states that "the University by creating the OSM and MPB and distributing UA Student Media Funds, thereby 'open[ed] property limited to use by certain groups of dedicated solely to the discussion of certain subjects.'" Doc. 26-1 at 19.

16

Damico's conduct under that prong because Huggins frames his speech-restriction claim against Damico in terms of viewpoint discrimination.").

To the extent the Court determines the suspensions of *Alice* and *Nineteen Fifty-Six* constitute a speech restriction requiring forum analysis, Plaintiffs are not likely to succeed on the merits of their First Amendment claims because the suspensions were clearly not due to the viewpoints expressed by the magazines or their contributors.

## I.    Plaintiffs Cannot Show a Substantial Likelihood of Success on the Merits.

### A.    *Alice* and *Nineteen Fifty-Six* Were Not Suspended Because of the Viewpoints Expressed in the Magazines or by Their Contributors.

Viewpoint discrimination "targets not merely subject matter 'but particular views taken by speakers on a subject.'" *Vidal v. Elster*, 602 U.S. 286, 286 (2024) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). Critically, "viewpoint discrimination requires a defendant to have based his conduct on the plaintiff's viewpoint." *Huggins*, 151 F.4th at 1284. Plaintiffs argue the magazines' "race and sex-specific viewpoints were evident," based on *Alice*'s mission to "highlight and amplify the views and experiences of women," and *Nineteen Fifty-Six*'s mission to highlight "the views and experiences of Black people," and then state, without citing any evidence, that the University found these

17

viewpoints "objectionable." (Doc. 26-1 at 24).[10] As examined at length below, the evidence proves *Alice* and *Nineteen Fifty-Six* were suspended due to concerns about expanding access rather than the viewpoints published in the magazines or held by their contributors. (Ex. 1 at ¶¶ 39-48). Plaintiffs even admit that the University had no problem with "the content of *Alice* and *Nineteen Fifty-Six*." (Doc. 26-1 at 16). This evidence, combined with the *lack* of evidence that the suspensions were due to the viewpoints expressed in the magazines, is sufficient to defeat Plaintiffs' request for a preliminary injunction. *See, e.g.*, *Naples Pride, Inc. v. City of Naples*, No. 25-11756, 2025 U.S. App. LEXIS 17858, at *4 (11th Cir. June 6, 2025) (staying preliminary injunction for viewpoint discrimination claim because "the city has a substantial case that the two permit conditions were not imposed based on Naples Pride's viewpoint").

As an initial matter, Plaintiffs' viewpoint discrimination claims fail because they have not identified any specific viewpoints the University purportedly discriminated against. Plaintiffs' Motion claims, "*Alice* reflected the magazine's mission and the editorial perspectives of the students seeking to highlight and amplify the views and experiences of women and people who do not identify as

---

[10] Plaintiffs' argument also relies on the idea of a unified "black" or "women's" viewpoint that can be applied wholesale to members of these groups. The Supreme Court has rejected the "offensive and demeaning assumption that [students] of a particular race, because of their race, think alike." *SFFA*, 600 U.S. at 187 (quoting *Miller v. Johnson*, 515 U.S. 900, 911-912 (1995)).

cisgender men about issues related to gender, sexuality, and various topics." Doc. 26-1 at 20. Similarly, it claims "*Nineteen Fifty-Six* typically reflected the magazines mission and the editorial perspectives of students interested in the views and experiences of Black people, Black Culture, race, and an array of other related topics." *Id.* These "topics," however, are not viewpoints. There are a wide array of viewpoints held related to these various topics. Surely, even women, non-cisgender men, and Black people hold a variety of viewpoints on each of these topics. As the Supreme Court has cautioned, it is an "'offensive and demeaning assumption that [students] of a particular race, because of their race, think alike,' at the very least alike in the sense of being different from nonminority students." *SFFA*, 600 U.S. at 220-221 (quoting *Miller*, 515 U. S. at 911-912). If Plaintiffs cannot identify the specific viewpoints that are allegedly being discriminated against, they necessarily cannot carry their burden of showing a "substantial likelihood of success on the merits."

Even assuming Plaintiffs were able to articulate any specific viewpoints, their claims still fail as there is no evidence the University suspended either of the magazines on the basis of any of Plaintiffs' viewpoints. To the contrary, the University has provided substantial evidence demonstrating the decision to suspend the magazines was based on expanding educational opportunities and concerns that continued support of the magazines as official University publications did not

19

conform to the Department of Justice's Guidance. (Ex.1 at ¶¶ 26-30). Plaintiffs argue the fact that participation in *Alice* and *Nineteen Fifty-Six* were open to all students regardless of race or sex, shows the University's proffered explanation are just a cover. Plaintiffs' argument, however, ignores the facts. For at least the last two years *Alice's* entire paid student staff was made up of women, and all of *Nineteen Fifty-Six's* paid student staff was made up of Black students. (*Id.* at ¶ 28). According to the Department of Justice's Guidance, "Even if access is technically open to all, the identity-based focus creates a perception of segregation and may foster a hostile environment." Doc. 26-25. In other words, the University had legitimate, non-viewpoint-based reasons to be concerned the continued funding of *Alice* and *Nineteen Fifty-Six* did not meet the best practices laid out in the Department of Justice's Guidance.

Plaintiffs claim that "[i]n suspending *Alice* and *Nineteen Fifty-Six*—and not, for example, *The Crimson White* or *Marr's Field Journal*—UA engaged in the exact type of viewpoint discrimination that the Court in *Rosenberger* deemed unconstitutional." Doc. 26-1 at 21. A reading of *The Crimson White*, however, proves the University's suspensions were not viewpoint-based. Contrary to Plaintiffs' assumptions, *The Crimson White* regularly publishes content highlighting the perspectives of Black and female students. In fact, on October 21, 2021, *Nineteen Fifty-Six* and *The Crimson White* issued a joint Legacy Edition of *The Crimson*

3582844.1

*White*. (Ex. 1 at ¶ 42).[11] In that issue, Keely Brewer and Tionna Tate,[12] the editors-in-chief of *The Crimson White* and *Nineteen Fifty-Six* respectively, wrote joint Letters from the Editors. (*Id.* at ¶ 43).[13] In this piece, Ms. Brewer, of *The Crimson White*, wrote, "Our histories differ, but the current staffs of both publications share the same goal: to leave a legacy of diversity and anti-racism while advocating for all students." (*Id.*). If *Nineteen Fifty-Six* and *The Crimson White* "share the same goal," the fact that *The Crimson White* has not been suspended proves the suspensions were not viewpoint based.

Even after the suspensions, *The Crimson White* continues to publish similar content. In fact, *The Crimson White* has published opinion pieces critical of the University's decision to suspend *Alice* and *Nineteen Fifty-Six*. (*Id.* at ¶ 46).[14] *The Crimson White* has also published favorable reviews of *Selene* and *Sixty-Three*, the magazines being set up by the Plaintiffs as replacements for *Alice* and *Nineteen Fifty-Six*. (*Id.* at ¶ 47).[15] Finally, *The Crimson White* has run pieces related to women,

---

[11] Available at https://www.yumpu.com/en/document/view/65927021/1956-the-crimson-white-legacy-edition-october-2021 (last visited April 27, 2026).

[12] According to Plaintiffs' Brief, Ms. Tate was also the founder of *Nineteen Fifty-Six*.

[13] Available at https://thecrimsonwhite.com/83313/opinion/legacy-edition-letters-from-the-editors/ (last visited April 27, 2026).

[14] Available at https://thecrimsonwhite.com/125444/opinion/letter-to-the-editor-eighty-student-media-alumni-condemn-shuttering-of-campus-magazines-urge-support-for-students/ (last visited April 27, 2026).

[15] Available at https://thecrimsonwhite.com/128568/culture/culture-pick-the-black-legacy-continues-with-sixty-three/; https://thecrimsonwhite.com/128529/culture/culture-pick-selene-is-an-enjoyable-read-and-a-powerful-publication/ (last visited April 27, 2026).

gender, and sexuality, even after the closure of *Alice*. (*Id.* at ¶ 48). For instance, on March 29, 2026, it ran an opinion piece titled "Men's internet phenomena are given more attention than women's." (*Id.*).[16] On January 21, 2026, *The Crimson White* ran an opinion piece titled "There's a reason why women love 'Heated Rivalry.'" (*Id.*).[17] Neither the University, OSM, nor the MPB have interfered with The Crimson White's decision to run these pieces, and the newspaper remains free to run pieces espousing similar viewpoints in the future. (*Id.* at ¶ 49).

Finally, Plaintiffs' claims of viewpoint discrimination are undercut by the University's ongoing efforts to develop a feature magazine that will openly encourage contributions from all students on campus—including the former contributors to *Alice* and *Nineteen Fifty-Six*. (Ex. 2 at ¶ 33). The University will have no editorial control over the viewpoints expressed in the new magazine, and administrators have actively reached out to the student contributors of *Alice* and *Nineteen Fifty-Six* for their input in developing the new magazine. (*Id.* at ¶¶ 24, 31; Ex. 1 at ¶¶ 34-38). Further, any content that could have been published in future editions of *Alice* and *Nineteen Fifty-Six* will be eligible for publication in the new magazine, subject to the discretion of the magazine's student-led editorial board.

---

[16] Available at https://thecrimsonwhite.com/128074/opinion/opinion-mens-internet-phenomena-are-given-more-attention-than-womens/ (last visited April 27, 2026).

[17] Available at https://thecrimsonwhite.com/126022/opinion/opinion-theres-a-reason-why-women-love-heated-rivalry/ (last visited April 27, 2026).

(Ex. 1 at ¶ 37). In fact, the University recently selected the editor-in-chief for the new magazine, and it selected an individual who previously served as a paid staff member for one of the suspended magazines. (Ex. 2 at ¶ 33). This individual, who previously worked for one of the suspended magazines, not the University, will have the discretion to determine the viewpoints that will be featured and published in the new magazine. (*Id.* at ¶ 13). In sum, the evidence demonstrates that that the University's decision to suspend *Alice* and *Nineteen Fifty-Six*, in favor of a new student-run magazine, had nothing to do with the viewpoints expressed by *Alice* and *Nineteen Fifty-Six*.

## B.    *Rosenberger* Does Not Support Plaintiffs' Claims.

Plaintiffs' First Amendment argument relies heavily on the Supreme Court's decision in *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995), arguing that the present case presents "nearly identical factual circumstances." (Doc. 26-1 at 5). While *Rosenberger* also involved a student magazine, the findings from *Rosenberger* do not translate to the facts of this case. Unlike *Rosenberger*, here the University has not announced a policy which, "by [its] very terms . . . selects for disfavored treatment those student journalistic efforts with [black or female] viewpoints." *Id.* at 831. To the contrary, the University encourages black and female students to participate in the student media publications under its purview and is currently in the process of developing a new magazine that will allow for publication

23

of *all* viewpoints, including viewpoints that might have been expressed in future editions of *Alice* and *Nineteen Fifty-Six.* Indeed, as set forth above, such viewpoints continue to be published in other University publications, like *The Crimson White*, and a former member of the suspended magazines' paid staff will be editor-in-chief of the new magazine. (Ex. 2 at ¶ 33). This is a far cry from the policy in *Rosenberger* which categorically barred funding for any activity that "primarily promotes or manifests a particular belief in or about a deity or an ultimate reality." *Rosenberger*, 515 U.S. at 825.

The weakness of Plaintiffs' attempt to identify with *Rosenberger* is demonstrated by the following "modification of the holding in *Rosenberger*" proffered in their Brief: "'it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about [race and/or sex] . . . except those dealing with the subject matter from a [Black person's and/or woman's] standpoint.'" (Doc. 26-1 at 26) (quoting *Rosenberger*, 515 U.S. at 830). This "modification" turns the facts, in this case, on their head. Plaintiffs have presented *no* evidence that the University permits school property to be used for the presentation of all views about race or sex *except* those from a black person's or woman's standpoint. Quite the opposite, the University continues to allow the presentation of *all* views about race and sex in the publications under its purview. (Ex. 1 at ¶¶ 42-49).

24

Plaintiffs' real complaint is that the University suspended the magazines where they work. Neither the First Amendment nor *Rosenberger*, however, guarantee the continued existence of those magazines. The University is free to decide how best to allocate the limited resources available for supporting student-run media, as long as its decisions are viewpoint neutral and reasonable. Here, the evidence proves the University's suspension of *Alice* and *Nineteen Fifty-Six* had nothing to do with the publications' viewpoints. As such, Plaintiffs cannot demonstrate a substantial likelihood of success on the merits.

## II.    Plaintiffs' Delay in Seeking a Preliminary Injunction Demonstrates the Lack of an Imminent Irreparable Harm.

"As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits. Rather, a court must also consider whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (citation omitted) (quoting *Winter*, 555 U.S. at 32). "A preliminary injunction requires showing 'imminent' irreparable harm," and "a delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal*, 840 F.3d at 1248. This principle applies to cases involving claimed First Amendment injuries. *See Yoseph v. Fla. Dep't of Corr.*, No. 25-10113, 2025 U.S. App. LEXIS 20718, at

25

*13 (11th Cir. Aug. 14, 2025) ("Although [plaintiff] contends that such a delay should not have been considered because First Amendment freedoms are involved, he has pointed to no case law from this Court or the Supreme Court holding that a delay in filing suit is an improper consideration when assessing irreparable harm where First Amendment rights are involved."); *Naples Pride*, 2025 U.S. App. LEXIS 17858 at *3-4 (court abused discretion in granting preliminary injunction in part because plaintiffs delayed filing First Amendment claim).

Here, Plaintiffs' delay in seeking their requested preliminary injunction demonstrates there is no threat of imminent irreparable harm. Plaintiffs were informed about the suspension of *Alice* and *Nineteen Fifty-Six* on December 1, 2025. (Doc. 26-1 at 15). They did not file the Complaint until March 23, 2026, (Doc. 1), and did not seek a preliminary injunction until March 31, 2026, (Doc. 26), nearly four months after the suspensions. Plaintiffs' four-month delay in seeking a preliminary injunction weighs against a finding of irreparable harm. *Wreal,* 840 F.3d at 1248.

## CONCLUSION

What happened here is the University determined it was in its students' best interest to expand opportunities for student involvement with student media, and, in response to the Department of Justice's Guidance, it decided to suspend Plaintiffs' magazines. There is simply no evidence that the University's decision was based, in

26

3582844.1

any way, on Plaintiffs' viewpoints. Far from it, the evidence demonstrates that *The Crimson White* has expressed, and continues to express, similar viewpoints, and the University is developing a new student magazine that is free to print any of the same material printed in *Alice* or *Nineteen Fifty-Six*. Importantly, this new magazine first editor-in-chief is a student who previously worked as part of the paid staff for one of the suspended magazines. Consequently, Plaintiffs cannot show a substantial likelihood of success on the merits, and their Motion is due to be denied.

Respectfully Submitted,

*/s/ Cole R. Gresham*
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Samuel A. Cochran (ASB-1354-R84D)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone: (205) 868-6000
jezelle@starneslaw.com
cgresham@starneslaw.com
scochran@starneslaw.com

*Counsel for Defendants*

27

3582844.1

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this document using the Court's CM/ECF system on April 27, 2025, which will serve all counsel of record.

_/s/ Cole R. Gresham_____

Cole R. Gresham
*Counsel for Defendants*

28

3582844.1