FILED

2026 Apr-27  PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| RIHANNA POINTER, GRANT STURDIVANT, TIMONI TAITE, JALEEL MATANMI, JERMAINE BALL, SARA BETH CADDELL, GABRIELLE GUNTER, and EMMY WAUGH,<br><br>    Plaintiffs,<br><br>vs.<br><br>SCOTT PHELPS in his official capacity as President Pro Tempore University of The Board of Trustees of The University of Alabama, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, ANGUS R. COOPER III, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, KENNETH VANDERVOORT, and KAY IVEY in their official capacities as members of The Board of Trustees of The University of Alabama<br><br>    Defendants. | Case No. 7:26-cv-00476-EGL |

## AFFIDAVIT OF STEVEN HOOD

STATE OF ALABAMA      )
                          )
COUNTY OF TUSCALOOSA   )

Before me, the undersigned authority, in and for said county and state, personally appeared Steven Hood, who, after being duly sworn by me under oath, deposes and states as follows:

1. My name is Steven Hood. I am over the age of nineteen and have personal knowledge of the testimony in this affidavit.

2. I am the Vice President for Student Life at the University of Alabama ("UA" or the "University"). I have held this position since June 2023.

3. Before being named VP for Student Life, I served in various roles at UA including Senior Associate Vice President for Student Life, Interim Vice President for Student Life, Associate Vice President for Student Life, Interim Vice President of Student Affairs, and Executive Director of Housing and Residential Communities. I have been employed by UA since 2011.

4. As part of my duties, I oversee UA's Division of Student Life.

5. UA's Office of Student Media ("OSM") is housed within the Division of Student Life.

6. OSM provides educational and programming opportunities for UA students, and is home to several student media enterprises, including *Bama Life*

*Newsletter*, *Black Warrior Review*, *The Crimson White*, *Marr's Field Journal*, *Southern Historian*, and *WVUA-FM*.

7.      These publications operate within the Office of Student Media, and a majority of them fall under the purview of UA's Media Planning Board ("MPB"), a standing committee of the University that reports to me.

8.      As Vice President of Student Life, I appoint a designee to serve as an ex officio, non-voting advisory member of MPB.

9.      It is my duty to review and approve the appointment of four faculty members to serve on MPB and to appoint the chair of MPB.

10.     OSM does not provide funding and resources to all student publications as a matter of course.

11.     OSM oversees the effective management of the student media enterprises under its purview.

12.     The student media enterprises under MPB's purview are official student publications that receive funding from the University and are published by the OSM.

13.     MPB's decisions to affiliate with or suspend student media enterprises are subject to my review.

14.     Student media enterprises under MPB's purview are part of a slate of programs and learning opportunities UA makes available to students.

15. Student media enterprises under MPB's purview have complete editorial autonomy, and UA does not interfere with the content-related decisions of those student-run media enterprises.

16. MPB affiliated with *Alice* in 2015.

17. MPB affiliated with *Nineteen Fifty-Six* in 2020.

18. *Alice* and *Nineteen Fifty-Six* are the only two magazines managed by MPB.

19. *Alice* and *Nineteen Fifty-Six* were not freestanding publications. They were official UA-student publications that receive funding from the University and are published by the OSM under the jurisdiction of MPB. They were part of the slate of programs and learning experiences the University offers to students.

20. Each year, the MPB appoints an editor-in-chief for both magazines from a slate of student applicants.

21. The paid staff members of *Alice* and *Nineteen Fifty-Six* are employed by UA to perform their editorial duties and are paid by OSM for their work.

22. The rights and websites associated with both magazines are owned by UA.

23. OSM covered the cost of printing, equipment, and supplies for both magazines.

24.    Despite MPB's duty to govern and OSM's responsibility to oversee and manage *Alice* and *Nineteen Fifty-Six*, neither MPB nor OSM ever exerted editorial control over the content published in *Alice* or *Nineteen Fifty-Six*.

25.    *Alice* and *Nineteen Fifty-Six* are the only student-run magazines under MPB's purview.

26.    In 2025, the University became concerned that *Alice* and *Nineteen Fifty-Six*, as official University-funded publications housed within and published by OSM, were "by and for" students of only one race or sex.

27.    The University wanted to ensure that all students felt welcome to participate in the programs that receive funding from the OSM, particularly in light of the Department of Education's February 2025 "Dear Colleague" letter, (attached hereto as **Exhibit A**), and the Department of Justice's memorandum titled *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination*, (attached hereto as **Exhibit B**.

28.    Even though *Alice* and *Nineteen Fifty-Six* were technically open to all students, it appears that for at least the past two academic years, the paid staff has consisted entirely of black students for *Nineteen Fifty-Six* and female students for *Alice*.

29.    These concerns were heightened by the fact that *Alice* and *Nineteen Fifty-Six* were student publications funded and published by the University, were

staffed by paid University employees, and were held out to students as University programming.

30. Because of these concerns, the University decided to suspend *Alice* and *Nineteen Fifty-Six* and to develop a new feature magazine that provides similar opportunities to *Alice* and *Nineteen Fifty-Six*.

31. On December 1, 2025, I attended a meeting with the editors and contributors of *Alice* and *Nineteen Fifty-Six* and informed them of the University's decision to suspend the magazines.

32. During the meeting, I explained the University's concerns that *Alice* and *Nineteen Fifty-Six*, as University-sponsored publications housed within OSM, raised federal compliance concerns.

33. I informed students at the meeting that the currently paid staff members of each magazine would continue to receive their stipends for the remainder of the academic year.

34. I also informed the students that OSM intends to work with students to develop a new magazine that encourages participation from all students in the campus community regardless of race or sex, and that OSM would like the editors and contributors of *Alice* and *Nineteen Fifty-Six* to work with OSM to develop the new magazine.

35. Since the meeting, OSM has reached out to staff members of both magazines welcoming their involvement and input in developing OSM's new feature magazine.

36. OSM is currently working with a group of interested students to develop the new magazine, which hopes to publish its first issue in Fall 2026, and an UA student has been selected as editor-in-chief for the new magazine.

37. Any content that could have been published in future editions of *Alice* and *Nineteen Fifty-Six* will be eligible for publication in the new magazine, subject to the discretion of the future magazine's editor-in-chief.

38. The University hopes the new magazine will encourage engagement and participation from all members of the student community, regardless of their race, sex, or viewpoint, and hopes the former contributors to *Alice* and *Nineteen Fifty-Six* will seek to work with the new magazine.

39. *Alice* and *Nineteen Fifty-Six* were not suspended because the University took issue with the content or viewpoints expressed in the magazines, nor were they suspended because the University disfavors the magazines' contributors or target audiences.

40. The University's decision was based on its concerns that participation and engagement with University-funded and University-published publications was perceived to be encouraged or discouraged based on students' race and sex.

41.    Neither *Alice* nor *Nineteen Fifty-Six* were suspended as a result of any of the viewpoints they published.

42.    Many of the viewpoints that were expressed in *Alice* and *Nineteen Fifty-Six* have been, and continue to be, expressed in other publications managed by OSM under the purview of MPB. For instance, on October 21, 2021, *Nineteen Fifty-Six* and *The Crimson White* issued a joint Legacy Edition of *The Crimson White.*

43.    In the Legacy Edition, Keely Brewer and Tionna Tate, the editors-in-chief of *The Crimson White* and *Nineteen Fifty-Six* respectively, wrote joint Letters from the Editors. In the piece, Ms. Brewer wrote "Our histories differ, but the current staffs of both publications share the same goal: to leave a legacy of diversity and anti-racism while advocating for all students."

44.    The *Crimson White* also published an article by the Nineteen Fifty-Six Staff on February 28, 2024, titled "A moment in the spotlight: Black women who are making waves in the music industry."

45.    *The Crimson White* also published an article by Samantha White a Nineteen Fifty-Six Contributing Writer, on October 19, 2022, titled "Black students should be supported wherever they go."

46.    *The Crimson White* has published opinion pieces critical of the University's decision to close *Nineteen Fifty-Six* and *Alice.* On December 3, 2025, it

8

ran a letter to the editor titled, "Eighty student media alumni condemn shuttering of campus magazines, urge support for students."

47.    On April 15, 2026, *The Crimson White* ran profiles of *Selene* (titled: "Selene is an enjoyable read and a powerful publication") and *Sixty-Three* (titled: "The Black legacy continues with Sixty-Three"), the magazines being set up by the Plaintiffs as replacements for *Alice* and *Nineteen Fifty-Six*.

48.    *The Crimson White* has also run pieces related to women, gender, and sexuality, even after the closure of *Alice*. For instance, on March 29, 2026, it ran an opinion piece titled "Men's internet phenomena are given more attention than women's." On January 21, 2026, *The Crimson White* ran an opinion piece titled "There's a reason why women love 'Heated Rivalry.'"

49.    Neither the University, OSM, or MPB have interfered with *The Crimson White's* decision to run these pieces, and *The Crimson White* remains free to run pieces espousing similar viewpoints in the future.

FURTHER AFFIANT SAITH NOT.

_____
STEVEN HOOD

STATE OF ALABAMA          )
TUSCALOOSA COUNTY      )

    Before me, the undersigned, a Notary Public, in and for said County and State, personally appeared Steven Hood, who is known to me, who, after being duly sworn, deposes and says that he/she has read the above and foregoing Affidavit, and that said facts stated therein are true to the best of his/her knowledge and belief.

    Sworn to and subscribed before me this 24th day of April, 2026.

_____
Notary Public
My Commission Expires: October 30, 2028

(OFFICIAL NOTARY SEAL)



# EXHIBIT A

On April 24, 2025, a federal court enjoined the Department from "enforcing and/or implementing" the following: Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard (Feb. 14, 2025), Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (first issued on Feb. 28, 2025), End DEI Portal, and Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification Under Title VI and SFFA v. Harvard (April 3, 2025) (certification requirement) against the plaintiff National Education Association, et al., its members, and any entity that employs, contracts with, or works with its members. See, Nat'l Educ. Ass'n v. United States Dep't of Educ., No. 25-CV-091-LM (D.N.H. Apr. 24, 2025). As a result, the Department of Education's Office for Civil Rights will not take any enforcement action, or otherwise implement, the February 28, 2025, Dear Colleague Letter, associated FAQs, the End DEI Portal, or the certification requirement until further notice.

### UNITED STATES DEPARTMENT OF EDUCATION
### OFFICE FOR CIVIL RIGHTS

**THE ACTING ASSISTANT SECRETARY**

**February 14, 2025**

Dear Colleague:

Discrimination on the basis of race, color, or national origin is illegal and morally reprehensible. Accordingly, I write to clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance from the United States Department of Education (Department).[1] This letter explains and reiterates existing legal requirements under Title VI of the Civil Rights Act of 1964,[2] the Equal Protection Clause of the United States Constitution, and other relevant authorities.[3]

In recent years, American educational institutions have discriminated against students on the basis of race, including white and Asian students, many of whom come from disadvantaged backgrounds and low-income families. These institutions' embrace of pervasive and repugnant race-based preferences and other forms of racial discrimination have emanated throughout every facet of academia. For example, colleges, universities, and K-12 schools have routinely used race as a factor in admissions, financial aid, hiring, training, and other institutional programming. In a shameful echo of a darker period in this country's history, many American schools and universities even encourage segregation by race at graduation ceremonies and in dormitories and other facilities.

---

[1] Throughout this letter, "school" is used generally to refer to preschool, elementary, secondary, and postsecondary educational institutions that receive federal financial assistance from the Department.

[2] Title VI provides that: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d, *et seq.*; 34 C.F.R. § 100, *et seq.*

[3] This document provides significant guidance under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). This guidance does not have the force and effect of law and does not bind the public or create new legal standards. This document is designed to provide clarity to the public regarding existing legal requirements under Title VI, the Equal Protection Clause, and other federal civil rights and constitutional law principles. If you are interested in commenting on this guidance, please email your comment to OCR@ed.gov or write to the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, S.W., Washington, D.C. 20202. For further information about the Department's guidance processes, please visit the Department's webpage here.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2

Educational institutions have toxically indoctrinated students with the false premise that the United States is built upon "systemic and structural racism" and advanced discriminatory policies and practices. Proponents of these discriminatory practices have attempted to further justify them—particularly during the last four years—under the banner of "diversity, equity, and inclusion" ("DEI"), smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline.

But under any banner, discrimination on the basis of race, color, or national origin is, has been, and will continue to be illegal.

The Supreme Court's 2023 decision in *Students for Fair Admissions v. Harvard*[4] (*SFFA*), which clarified that the use of racial preferences in college admissions is unlawful, sets forth a framework for evaluating the use of race by state actors and entities covered by Title VI. The Court explained that "[c]lassifying and assigning students based on their race" is lawful only if it satisfies "strict scrutiny," which means that any use of race must be narrowly tailored—that is, "necessary"—to achieve a compelling interest.[5] To date, the Supreme Court has recognized only two interests as compelling in the context of race-based action: (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute"; and (2) "avoiding imminent and serious risks to human safety in prisons, such as a race riot."[6] Nebulous concepts like racial balancing and diversity are not compelling interests. As the Court explained in *SFFA*, "an individual's race may never be used against him" and "may not operate as a stereotype" in governmental decision-making.[7]

Although *SFFA* addressed admissions decisions, the Supreme Court's holding applies more broadly. At its core, the test is simple: If an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law. Federal law thus prohibits covered entities from using race in decisions pertaining to admissions, hiring, promotion, compensation, financial aid, scholarships, prizes, administrative support, discipline, housing, graduation ceremonies, and all other aspects of student, academic, and campus life. Put simply, educational institutions may neither separate or segregate students based on race, nor distribute benefits or burdens based on race.

Although some programs may appear neutral on their face, a closer look reveals that they are, in fact, motivated by racial considerations.[8] And race-based decision-making, no matter the form, remains impermissible. For example, a school may not use students' personal essays, writing samples, participation in extracurriculars, or other cues as a

---

[4] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023).
[5] *Id.* at 207.
[6] *Ibid.*
[7] *Id.* at 218.
[8] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

Page 3

means of determining or predicting a student's race and favoring or disfavoring such students.[9]

Relying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systematic one. It would, for instance, be unlawful for an educational institution to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity.

Other programs discriminate in less direct, but equally insidious, ways. DEI programs, for example, frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not. Such programs stigmatize students who belong to particular racial groups based on crude racial stereotypes. Consequently, they deny students the ability to participate fully in the life of a school.

The Department will no longer tolerate the overt and covert racial discrimination that has become widespread in this Nation's educational institutions. The law is clear: treating students differently on the basis of race to achieve nebulous goals such as diversity, racial balancing, social justice, or equity is illegal under controlling Supreme Court precedent.

All students are entitled to a school environment free from discrimination. The Department is committed to ensuring those principles are a reality.

This letter provides notice of the Department's existing interpretation of federal law. Additional legal guidance will follow in due course. The Department will vigorously enforce the law on equal terms as to all preschool, elementary, secondary, and postsecondary educational institutions, as well as state educational agencies, that receive financial assistance.

The Department intends to take appropriate measures to assess compliance with the applicable statutes and regulations based on the understanding embodied in this letter beginning no later than 14 days from today's date, including antidiscrimination requirements that are a condition of receiving federal funding.

All educational institutions are advised to: (1) ensure that their policies and actions comply with existing civil rights law; (2) cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends; and (3) cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race.

---

[9] *Students for Fair Admissions*, 600 U.S. at 230 ("[U]niversities may not simply establish through application essays or other means the regime we hold unlawful today.").

Page 4

Institutions that fail to comply with federal civil rights law may, consistent with applicable law, face potential loss of federal funding.

Anyone who believes that a covered entity has unlawfully discriminated may file a complaint with OCR. Information about filing a complaint with OCR, including a link to the online complaint form, is available here.

Thank you in advance for your commitment to providing our Nation's students with an educational environment that is free of race, color, or national origin discrimination.


Sincerely,

/s/
Craig Trainor
Acting Assistant Secretary for Civil Rights
United States Department of Education

# EXHIBIT B



## Office of the Attorney General
### Washington, D. C. 20530

July 29, 2025

MEMORANDUM FOR ALL FEDERAL AGENCIES

FROM:                    THE ATTORNEY GENERAL

SUBJECT:                 GUIDANCE FOR RECIPIENTS OF FEDERAL FUNDING
                         REGARDING UNLAWFUL DISCRIMINATION

## I.    INTRODUCTION

One of our Nation's bedrock principles is that all Americans must be treated equally. Not only is discrimination based on protected characteristics illegal under federal law, but it is also dangerous, demeaning, and immoral. Yet in recent years, the federal government has turned a blind eye toward, or even encouraged, various discriminatory practices, seemingly because of their purportedly benign labels, objectives, or intentions. No longer. Going forward, the federal government will not stand by while recipients of federal funds engage in discrimination.

This guidance clarifies the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ("DEI") programs.[1] Entities receiving federal funds, like all other entities subject to federal antidiscrimination laws, must ensure that their programs and activities comply with federal law and do not discriminate on the basis of race, color, national origin, sex, religion, or other protected characteristics—no matter the program's labels, objectives, or intentions. In furtherance of that requirement, this guidance identifies "Best Practices" as non-binding suggestions to help entities comply with federal antidiscrimination laws and avoid legal pitfalls; these are not mandatory requirements but rather practical recommendations to minimize the risk of violations.

Entities that receive federal financial assistance or that are otherwise subject to federal anti-discrimination laws, including educational institutions, state and local governments, and public and private employers, should review this guidance carefully to ensure all programs comply with their legal obligations.

---

[1] DEI programs go by other names as well, such as Diversity, Equity, Inclusion, and Accessibility ("DEIA") and Diversity, Equity, Inclusion, and Belonging ("DEIB").

## II.    EXECUTIVE SUMMARY

This guidance emphasizes the significant legal risks of initiatives that involve discrimination based on protected characteristics and provides non-binding best practices to help entities avoid the risk of violations. Key points include:

- **Statutory nondiscrimination requirements:** Federal law prohibits discrimination based on protected characteristics like race, sex, color, national origin, or religion.

- **Legal pitfalls of DEI Programs:** The use of terms such as "DEI," "Equity," or other euphemistic terms does not excuse unlawful discrimination or absolve parties from scrutiny regarding potential violations.

- **Prohibition on Protected Characteristics as Criteria:** Using race, sex, or other protected characteristics for employment, program participation, resource allocation, or other similar activities, opportunities, or benefits, is unlawful, except in rare cases where such discrimination satisfies the relevant level of judicial scrutiny.

- **Importance of Sex-Separated Intimate Spaces and Athletic Competitions:** Compelling employees to share intimate spaces with the opposite sex or allowing men to compete in women's athletic competitions would typically be unlawful.

- **Unlawful Proxy Discrimination:** Facially neutral criteria (e.g., "cultural competence," "lived experience," geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics.

- **Scrutiny of Third-Party Funding:** Recipients of federal funds should ensure federal funds do not support third-party programs that discriminate.

- **Protection Against Retaliation:** Individuals who object to or refuse to participate in discriminatory programs, trainings, or policies are protected from adverse actions like termination or exclusion based on that individual's opposition to those practices.[2]

## III.    KEY FEDERAL ANTIDISCRIMINATION PROVISIONS AND LAW

Federal antidiscrimination laws prohibit discrimination on the basis of protected characteristics, including race, color, religion, sex, and national origin. The U.S. Supreme Court has consistently held that policies or practices based upon protected characteristics are subject to

---

[2] Unlawful retaliation occurs when a federally funded entity takes adverse actions against employees, participants, or beneficiaries because they engage in protected activities related to opposing DEI practices they reasonably believe violate federal antidiscrimination laws.

rigorous judicial scrutiny. Race-based classifications are subject to strict scrutiny, requiring a compelling governmental interest and narrowly tailored means to achieve that interest.[3] Sex-based classifications are subject to heightened scrutiny, requiring an exceedingly persuasive justification and substantial relation to an important governmental objective.[4] Discrimination based on other protected characteristics, such as religion, is also evaluated under analogous standards.[5] Entities receiving federal funds must comply with applicable civil rights laws, including:

- **Title VI of the Civil Rights Act of 1964:** Prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. This includes most educational institutions, healthcare providers, and state and local government agencies.

- **Title VII of the Civil Rights Act of 1964:** Prohibits employment discrimination based on, or motivated by, race, color, religion, sex, or national origin, in any terms, conditions, or privileges of employment, including hiring, promotion, demotion, termination, compensation, job transfers, training, or access to employment privileges and benefits.

- **Title IX of the Education Amendments of 1972:** Prohibits discrimination based on sex in education programs or activities receiving federal financial assistance. Title IX protections extend beyond athletics and include addressing sexual harassment, sex-based harassment, admissions policies, and equal access to resources and programs.

---

[3] *See, e.g., Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 214 (2023) (holding racial classifications by public institutions are subject to strict scrutiny and racial classifications by private institutions can serve as basis for revoking funding under Title VI); *Ricci v. DeStefano*, 557 U.S. 557, 579 (2009) ("[E]xpress, race-based decision-making violates Title VII's command that employers cannot take adverse employment actions because of an individual's race."); *see also Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (holding grant program with race and sex preferences is unlawful under Equal Protection Clause).

[4] *See, e.g., United States v. Virginia*, 518 U.S. 515, 531 (1996).

[5] *See, e.g., Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 479 (2020) ("The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status . . . . [S]trict scrutiny applies . . . because Montana's no-aid provision discriminates based on religious status"); *Shapiro v. Thompson*, 394 U.S. 618, 631 (1969) (holding discriminating against individual for exercising fundamental constitutional rights is subject to heightened scrutiny), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (relying on Equal Protection principles in holding intentional discrimination against exercise of religion is subject to strict scrutiny).

- **Equal Protection Clause of the Fourteenth Amendment:** Prohibits States from denying any person the equal protection of the laws, relevant in the context of discrimination claims involving state or local government actions.

## IV.    UNLAWFUL DISCRIMINATORY POLICIES AND PRACTICES

The following is a non-exhaustive list of unlawful practices that could result in revocation of grant funding. Federal funding recipients may also be liable for discrimination if they knowingly fund the unlawful practices of contractors, grantees, and other third parties.

### A.    Granting Preferential Treatment Based on Protected Characteristics

#### 1.    What Constitutes Unlawful Preferential Treatment?

Preferential treatment occurs when a federally funded entity provides opportunities, benefits, or advantages to individuals or groups based on protected characteristics in a way that disadvantages other qualified persons, including such practices portrayed as "preferential" to certain groups. Such practices violate federal law unless they meet very narrow exceptions.

#### 2.    Examples of Unlawful Practices

**Race-Based Scholarships or Programs:** A university's DEI program establishes a scholarship fund exclusively for students of a specific racial group (e.g., "Black Student Excellence Scholarship") and excludes otherwise qualified applicants of other races, even if they meet academic or financial need criteria. This extends to any race-exclusive opportunities, such as internships, mentorship programs, or leadership initiatives that reserve spots for specific racial groups, regardless of intent to promote diversity. Such race-exclusive programs violate federal civil rights law by discriminating against individuals based solely on their race or treating people differently based on a protected characteristic without meeting the strict legal standards required for race-conscious programs.

**Preferential Hiring or Promotion Practices:** A federally funded entity's DEI policy prioritizes candidates from "underrepresented groups" for admission, hiring, or promotion, bypassing qualified candidates who do not belong to those groups, where the preferred "underrepresented groups" are determined on the basis of a protected characteristic like race.

**Access to Facilities or Resources Based on Race or Ethnicity:** A university's DEI initiative designates a "safe space" or lounge exclusively for students of a specific racial or ethnic group.

**B.      Prohibited Use of Proxies for Protected Characteristics**

**1.      What Constitutes Unlawful Proxies?**

Unlawful proxies occur when a federally funded entity intentionally uses ostensibly neutral criteria that function as substitutes for explicit consideration of race, sex, or other protected characteristics. While these criteria may appear facially neutral, they become legally problematic under any of the following circumstances:

- They are selected because they correlate with, replicate, or are used as substitutes for protected characteristics.

- They are implemented with the intent to advantage or disadvantage individuals based on protected characteristics.

**2.      Examples of Potentially Unlawful Proxies**

**"Cultural Competence" Requirements:** A federally funded university requires job applicants to demonstrate "cultural competence," "lived experience," or "cross-cultural skills" in ways that effectively evaluate candidates' racial or ethnic backgrounds rather than objective qualifications. This includes selection criteria that advantage candidates who have experiences the employer associates with certain racial groups. For instance, requiring faculty candidates to describe how their "cultural background informs their teaching" may function as a proxy if used to evaluate candidates based on race or ethnicity.

**Geographic or Institutional Targeting:** A federally funded organization implements recruitment strategies targeting specific geographic areas, institutions, or organizations chosen primarily because of their racial or ethnic composition rather than other legitimate factors.

**"Overcoming Obstacles" Narratives or "Diversity Statements":** A federally funded program requires applicants to describe "obstacles they have overcome" or submit a "diversity statement" in a manner that advantages those who discuss experiences intrinsically tied to protected characteristics, using the narrative as a proxy for advantaging that protected characteristic in providing benefits.

**C.      Segregation Based on Protected Characteristics**

**1.      What Constitutes Unlawful Segregation?**

Segregation based on protected characteristics occurs when a federally funded entity organizes programs, activities, or resources—such as training sessions—in a way that separates or restricts access based on race, sex, or other protected characteristics. Such practices generally violate federal law by creating unequal treatment or reinforcing stereotypes, regardless of the stated goal (e.g., promoting inclusion or addressing historical inequities). Exceptions are narrow

and include only cases where federal law expressly permits race-based remedies for specific, documented acts of past discrimination by the institution itself, or in specialized contexts such as correctional facilities where courts have recognized compelling institutional interests.

While compelled segregation is generally impermissible, failing to maintain sex-separated athletic competitions and intimate spaces can also violate federal law. Federally funded institutions that allow males, including those self-identifying as "women," to access single-sex spaces designed for females—such as bathrooms, showers, locker rooms, or dormitories—undermine the privacy, safety, and equal opportunity of women and girls. Likewise, permitting males to compete in women's athletic events almost invariably denies women equal opportunity by eroding competitive fairness. These policies risk creating a hostile environment under Title VII, particularly where they compromise women's privacy, safety, or professional standing, and can violate Title IX by denying women access to the full scope of sex-based protections in education. To ensure compliance with federal law and to safeguard the rights of women and girls, organizations should affirm sex-based boundaries rooted in biological differences.

### 2.      Examples of Unlawful Practices

**Race-Based Training Sessions:** A federally funded university hosts a DEI training program that requires participants to separate into race-based groups (e.g., "Black Faculty Caucus" or "White Ally Group") for discussions, prohibiting individuals of other races from participating in specific sessions. In contrast, a "Faculty Academic Support Network" open to all faculty interested in promoting student success avoids reliance on protected characteristics and complies with federal law.

**Segregation in Facilities or Resources:** A college receiving federal funds designates a "BIPOC-only study lounge," facially discouraging access by students of other races. Even if access is technically open to all, the identity-based focus creates a perception of segregation and may foster a hostile environment. This extends to any resource allocation—such as study spaces, computer labs, or event venues—that segregates access based on protected characteristics, even if intended to create "safe spaces." This does not apply to facilities that are single-sex based on biological sex to protect privacy or safety, such as restrooms, showers, locker rooms, or lodging.

**Implicit Segregation Through Program Eligibility:** A federally funded community organization hosts a DEI-focused workshop series that requires participants to identify with a specific racial or ethnic group (e.g., "for underrepresented minorities only") or mandates sex-specific eligibility, effectively excluding others who meet objective program criteria. Use of Protected Characteristics in Candidate Selection

### 3.      What Constitutes Unlawful Use of Protected Characteristics?

Unlawful use of protected characteristics occurs when a federally funded entity or program considers race, sex, or any other protected trait as a basis for selecting candidates for employment

(e.g., hiring, promotions), contracts (e.g., vendor agreements), or program participation (e.g., internships, admissions, scholarships, training). This includes policies that explicitly mandate representation of specific groups in candidate pools or implicitly prioritize protected characteristics through selection criteria, such as "diverse slate" requirements, diversity decision-making panels, or diversity-focused evaluations. It also includes requirements that contracting entities utilize a specific level of working hours from individuals of certain protected characteristics to complete the contract. Such practices violate federal law by creating unequal treatment or disadvantaging otherwise qualified candidates, regardless of any intent to advance diversity goals.

### 4.    Examples of Unlawful Practices

**Race-Based "Diverse Slate" Policies in Hiring:** A federally funded research institute adopts a policy requiring that all interview slates for faculty positions include a minimum number of candidates from specific racial groups (e.g., at least two "underrepresented minority" candidates), rejecting otherwise qualified candidates who do not meet this racial criterion. This extends to any policy that sets racial benchmarks or mandates demographic representation in candidate pools, such as requiring a certain percentage of finalists to be from "diverse" backgrounds.

**Sex-Based Selection for Contracts:** A federally funded state agency implements a DEI policy that prioritizes awarding contracts to women-owned businesses, automatically advancing female vendors or minority-owned businesses over equally or more qualified businesses without preferred group status. This includes any contract selection process that uses sex or race as a tiebreaker or primary criterion, such as policies favoring "minority- or women-owned" businesses without satisfying the appropriate level of judicial scrutiny.

**Race- or Sex-Based Program Participation:** A federally funded university's internship program requires that 50% of selected participants be from "underrepresented racial groups" or female students, rejecting equally or more qualified applicants who do not meet these demographic criteria. This extends to any program—such as scholarships, fellowships, or leadership initiatives—that uses race, sex, or any other protected characteristic as a selection criterion, even if framed as addressing underrepresentation.

### D.    Training Programs That Promote Discrimination or Hostile Environments

### 1.    What Constitutes Unlawful DEI Training Programs?

Unlawful DEI training programs are those that—through their content, structure, or implementation—stereotype, exclude, or disadvantage individuals based on protected characteristics or create a hostile environment. This includes training that:

- Excludes or penalizes individuals based on protected characteristics.

Memorandum for All Federal Agencies                                                                    Page 8
Subject: Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination

- Creates an objectively hostile environment through severe or pervasive use of presentations, videos, and other workplace training materials that single out, demean, or stereotype individuals based on protected characteristics.

### 2.    Examples of Unlawful Practices

**Trainings That Promote Discrimination Based on Protected Characteristics:** A federally funded school district requires teachers to complete a DEI training that includes statements stereotyping individuals based on protected characteristics—such as "all white people are inherently privileged," "toxic masculinity," etc. Such trainings may violate Title VI or Title VII if they create a hostile environment or impose penalties for dissent in ways that result in discriminatory treatment.[6]

### E.    Recommendations on Best Practices

**Ensure Inclusive Access:** All workplace programs, activities, and resources should be open to all qualified individuals, regardless of race, sex, or other protected characteristics. Avoid organizing groups or sessions that exclude participants based on protected traits. Some sex separation is necessary where biological differences implicate privacy, safety, or athletic opportunity.

**Focus on Skills and Qualifications:** Base selection decisions on specific, measurable skills and qualifications directly related to job performance or program participation. For example, rather than asking about "cultural competence," assess specific skills such as language proficiency or relevant educational credentials. Criteria like socioeconomic status, first-generation status, or geographic diversity must not be used if selected to prioritize individuals based on racial, sex-based, or other protected characteristics.

**Prohibit Demographic-Driven Criteria:** Discontinue any program or policy designed to achieve discriminatory outcomes, even those using facially neutral means. Intent to influence demographic representation risks violating federal law. For example, a scholarship program must not target "underserved geographic areas" or "first-generation students" if the criteria are chosen to increase participation by specific racial or sex-based groups. Instead, use universally applicable criteria, such as academic merit or financial hardship, applied without regard to protected characteristics or demographic goals.

**Document Legitimate Rationales:** If using criteria in hiring, promotions, or selecting contracts that might correlate with protected characteristics, document clear, legitimate rationales unrelated to race, sex, or other protected characteristics. Ensure these rationales are consistently applied and are demonstrably related to legitimate, nondiscriminatory institutional objectives.

**Scrutinize Neutral Criteria for Proxy Effects:** Before implementing facially neutral criteria, rigorously evaluate and document whether they are proxies for race, sex, or other protected

---

[6] Federal law allows for workplace harassment trainings that are focused on preventing unlawful workplace discrimination and that do not single out particular groups as inherently racist or sexist.

characteristics. For instance, a program targeting "low-income students" must be applied uniformly without targeting areas or populations to achieve racial or sex-based outcomes.

**Eliminate Diversity Quotas:** Focus solely on nondiscriminatory performance metrics, such as program participation rates or academic outcomes, without reference to race, sex, or other protected traits. And discontinue policies that mandate representation of specific racial, sex-based, or other protected groups in candidate pools, hiring panels, or final selections. For example, replace a policy requiring "at least one minority candidate per slate" with a process that evaluates all applicants based on merit.

**Avoid Exclusionary Training Programs:** Ensure trainings are open to all qualified participants, regardless of protected characteristics. Avoid segregating participants into groups based on race, sex, or other protected characteristics. Trainings should not require participants to affirm specific ideological positions or "confess" to personal biases or privileges based on a protected characteristic.

**Include Nondiscrimination Clauses in Contracts to Third Parties and Monitor Compliance:** Incorporate explicit nondiscrimination clauses in grant agreements, contracts, or partnership agreements, requiring third parties to comply with federal law, and specify that federal funds cannot be used for programs that discriminate based on protected characteristics. Monitor third parties that receive federal funds to ensure ongoing compliance, including reviewing program materials, participant feedback, and outcomes to identify potential discriminatory practices. Terminate funding for noncompliant programs.

**Establish Clear Anti-Retaliation Procedures and Create Safe Reporting Mechanisms:** Implement and communicate policies that prohibit retaliation against individuals who engage in protected activities, such as raising concerns, filing complaints, or refusing to participate in potentially discriminatory programs. Include these policies in employee handbooks, student codes of conduct, and program guidelines. Provide confidential, accessible channels for individuals to report concerns about unlawful practices.

## V.    CONCLUSION

Entities are urged to review all programs, policies, and partnerships to ensure compliance with federal law, and discontinue any practices that discriminate on the basis of a protected status. The recommended best practices provided in this guidance are non-binding suggestions to assist entities in avoiding legal pitfalls and upholding equal opportunity for all. By prioritizing nondiscrimination, entities can mitigate the legal, financial, and reputational risks associated with unlawful DEI practices and fulfill their civil rights obligations.