## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **RIHANNA POINTER et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **7:26-cv-476-EGL** |
| | ) | |
| **SCOTT PHELPS et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

The University of Alabama offers numerous educational opportunities, both inside and outside the classroom. To provide students with hands-on experience in media, UA funds and oversees a small slate of official student media enterprises. Students determine what to include in the publications, but like with its classes, UA determines which enterprises it will offer each semester. In 2025, the University funded six UA-branded publications and a radio station. Those publications included the school's official newspaper, two literary journals, a history journal, and two magazines: one "by and for women" and the other "a Black student-led magazine that amplifies Black voices." In late 2025, UA decided that the content of those magazines was too narrowly focused and could create liability for UA under federal anti-discrimination laws. The University closed the magazines and replaced them with one magazine open to content by and for all students, regardless of sex or race.

Plaintiffs are students who preferred the old magazines and want to participate next semester in those now-defunct University programs. They assert that the University has violated their free-speech rights by closing the magazines, and they seek a preliminary injunction that would force UA to reopen them.

There are at least three ways to analyze Plaintiffs' claim, and under each, the claim likely fails. *First*, whether to open or close a UA-sponsored magazine is a core curricular decision that constitutes UA's speech, and the Free Speech Clause does not dictate what classes UA must offer or what magazines UA must publish. *Second*, if one views the case through "forum" doctrine, the relevant forums here are the two magazines UA created. And because UA was not required to open the magazines, it is not required to maintain them. *Finally*, even if University sponsorship of student media is the relevant forum, any action by UA was reasonable and viewpoint neutral. Plaintiffs fail to define a viewpoint, much less show that UA discriminated based on viewpoint. UA's decision was, at most, content based. Its decision to not publish magazines about politics is based on content, not a "politics viewpoint." And its decision to close magazines "by and for" students of just one race or sex is a content-based decision, not discrimination against female or black viewpoints.

Because Plaintiffs are not likely to prevail on their claim, the Court **DENIES** their motion for a preliminary injunction. Doc. 26.

**A. FACTUAL BACKGROUND**

The University of Alabama is public institution of higher learning located in Tuscaloosa, Alabama.[1] Both inside and outside the classroom, UA offers undergraduate and graduate students an array of educational opportunities, including through the University's Office of Student Media (OSM). Doc. 1 at ¶26. UA describes the educational mission of OSM as follows:

> Student Media is all about giving UA students the tools they need to succeed—not just on campus, but anywhere in the world. It's a place to build communication skills, think critically, collaborate with others, and get ready for careers that cross industries, continents, and cultures. The goal is to train students to create high-quality content—news, info, entertainment—you name it. And they do it with the freedom to report responsibly, without censorship, while keeping things socially aware and financially smart.

Doc. 26-20 at 2.

The University has also created the Media Planning Board (MPB or the Board), "a standing committee of The University of Alabama" that "is empowered by and responsible to the President of the University through the Vice President for Student Life." Doc. 31-2 at 9. The MPB is governed by a Charter that sets forth the Board's authority, purpose, membership, and responsibilities. *See id.* The MPB's "chief responsibility is to provide oversight, guidance and support to student media at The University of Alabama through the professional and practical expertise of its

---

[1] *About*, THE UNIVERSITY OF ALABAMA, https://www.ua.edu/about/ (last visited May 22, 2026).

members." *Id.* The MPB's other responsibilities include overseeing the operation of all student media under its jurisdiction, approving general operational policies and procedures for student media, appointing student leaders for each enterprise, and "recommend[ing] the acceptance of additional media enterprises under the aegis of the MPB, in addition to discontinuing the affiliation with any student medium under its jurisdiction, subject to the procedures outlined herein." *Id.* at 12. The Charter notes that the MPB "recognizes that in the future new student media needs may appear," and "encourages the evolution of media to meet these needs." *Id.* at 9.

To establish a new student media enterprise (SME), a student (or group of students) must apply for affiliation with the MPB. *Id.* at 15. Once a student submits a proposal, it is subjected to multiple rounds of consideration by the UA Student Media Director, the MPB Administration Committee, and the full MPB. *Id.* at 15-16. When considering a proposal, the Administration Committee weighs, among other things, the audience and campus need for the publication, its purpose and structure, and any overlap with existing student media. *Id.* "[I]f deemed worthy," the proposal is submitted to the VP for Student Life for final approval. *Id.* at 15-16. The VP for Student Life may either reject the proposal or accept it for a probationary period, providing the University with complete discretion over whether to affiliate with any proposed student media. *Id.* Rejection may be appealed, *id.* at 16, but no criteria guarantee funding or University affiliation.

4

During the Fall 2025 semester, OSM published seven student-run media enterprises that were under the Board's jurisdiction. Doc. 26-21 at 3. These enterprises differed in format and subject matter: *The Crimson White*, the official student newspaper of the University; *Black Warrior Review*, a literary journal featuring fiction, poetry, and essays published by graduate students in the University's creative writing program; *Marr's Field Journal*, a literary journal written, edited and published by undergraduate students; *Southern Historian*, an annual journal of Southern history written, edited, and produced by graduate students in the University's history department; WVUA-FM, a radio station serving the UA community; and the two publications at issue here, *Alice* and *Nineteen Fifty-Six. See id.*[2]

The University began publishing *Alice* in 2015. Doc. 1 at ¶42. The magazine's mission statement declared that it "focus[es] on college women." *Id.* at ¶44. A plaintiff and former *Alice* editor described the magazine as having a diverse readership across genders and races, while noting that it "primarily attracts readers who identify as college-aged women." Doc. 26-10 at ¶14. She explained that "[w]hile other student publications like the *Crimson White* … may publish topics

---

[2]   *Media Opportunities*, STUDENT MEDIA, THE UNIVERSITY OF ALABAMA, https://studentmedia.sl.ua.edu/media-opportunities/ (last visited May 22, 2026).

similar to *Alice*, there are significant restrictions around type of writing, word count, and timelines for publications" that set *Alice* apart. *Id.* at ¶15.

The University began publishing *Nineteen Fifty-Six* in 2020, following a proposal from Plaintiff Tionna Taite. Doc. 31-2 at 19. The magazine "focused on Black culture, Black excellence, and Black student experiences at The University of Alabama." Doc. 26-23 at 2. Tate proposed the publication to "establish the first magazine tailored towards the black community at the University of Alabama," explaining that a "black student-led magazine" would "help increase diversity and inclusion on campus." Doc. 31-2 at 19. Before its suspension, the magazine published two print issues per academic year, with a mission to "amplif[y] Black voices within the University of Alabama's community." Doc. 26-1 at 7.

From their founding, *Alice* and *Nineteen Fifty-Six* were the only Board-affiliated magazines published by the University. Doc. 31-2 at 4, ¶17.

Each Board-affiliated student media enterprise is "supported and supervised as necessary and appropriate by the full-time professional staff of UA Student Media." Doc. 31-2 at 9. Upon approving an enterprise for affiliation, the MPB appoints its student leader and retains authority to "oversee the effective and efficient management of the media under its purview." *Id.* The Charter describes certain rights as "inherent" in the MPB's function, including editorial freedom, freedom from censorship and prior restraint, and protection of editors and managers from removal

6

or suspension based on "student, faculty, administrative or public disapproval of editorial policy and content." *Id.* Once appointed and approved, editorial staff may edit and publish without University interference. *Id.* But the Charter guarantees no student media enterprise continued funding. *Id.* at 12 ("The MPB" may "discontinu[e] the affiliation with any student medium under its jurisdiction, subject to the procedures outlined herein."). The Board thus retains authority to shape the University's media offerings to meet the needs of the student body. *Id.* at 9.

In late 2025, the University suspended publication of *Alice* and *Nineteen Fifty-Six* and began creating a new magazine designed to "encourage[] participation from all students in the campus community regardless of race or sex." Doc. 31-1 at 6, ¶¶30, 34. The decision was prompted by guidance from the Department of Education and the Department of Justice. *Id.* at 5, ¶27. In light of that guidance, UA was concerned that its only two official student magazines were operated "by and for" students of a single race or sex, and UA sought to ensure that "all students felt welcome to participate in the programs that receive funding from the OSM." *Id.* at 5, ¶¶26-27.

The Department of Education's "Dear Colleague" letter warned schools to be mindful of programs that appear neutral on their face—i.e. "open to all students"— but are in reality motivated by racial considerations. Doc. 31-1 at 12-15. The

Department stated its intention to take appropriate measures against schools engaging in overt or covert racial discrimination. *Id.*

The Department of Justice memorandum reinforced those concerns by providing federal funding recipients guidance on unlawful discriminatory practices and identifying a non-exhaustive list of examples that could result in funding revocation. *Id.* at 17-25. Among them, a "BIPOC-only study lounge" would violate federal law because even where "access is technically open to all," an "identity-based focus creates a perception of segregation." *Id.* at 22. Although *Alice* and *Nineteen Fifty-Six* were technically open to all students, the University concluded that their narrow, identity-specific subject matter could raise analogous federal compliance concerns. *Id.* at 5-6, ¶¶26-30.

The University is working with interested students to develop a replacement magazine. OSM sought input from former *Alice* and *Nineteen Fifty-Six* staff members, *id.* at 7, ¶¶35-36, and alumni of both publications are eligible to apply and to submit content that could have appeared in the suspended magazines, *id.* at 6-7, ¶¶34, 37. Notably, the new magazine's editor-in-chief previously served as a paid staff member for *Alice*. Doc. 31-2 at 6, ¶33; Doc. 26-9 at ¶19. The new publication will be a "general feature magazine" covering "lifestyle, art and social content … featuring stories highlighting voices from all backgrounds and perspectives and everyday people with compelling stories." Doc. 31-2 at 6, ¶30.

On March 23, 2026, several students who served or planned to serve as editors or contributors to *Alice* or *Nineteen Fifty-Six* sued members of the Board of Trustees of the University of Alabama System in their official capacities. Doc. 1 at ¶¶1-2. Plaintiffs allege that the University suspended and defunded the magazines because it disfavored their "editorial perspectives related to race and gender," in violation of their free-speech rights. *Id.* at ¶2. They seek a preliminary injunction restraining Defendants from suspending the publications and terminating their University funding. Doc. 26 at 2.

## B. JURISDICTION

Defendants do not contest standing, but the Court has an independent obligation to assure itself of jurisdiction before determining whether to enter a preliminary injunction. *AT&T Mobility, LLC v. Nat'l Association for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1359-60 (11th Cir. 2007). To establish standing, Plaintiffs must make three familiar showings, (1) an injury in fact, (2) that is traceable to Defendants' actions, and (3) that could be remedied by the Court. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). As to the first element, an injury in fact is one that is "concrete," "real, and not abstract." *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo*, 578 U.S. at 340). Plaintiffs have introduced evidence suggesting that they were harmed by the University's

9

decision to close *Alice* and *Nineteen Fifty-Six* because they likely would have benefited from participating in the magazines.

Plaintiff Sara Beth Caddell started working for *Alice* in Fall 2025 and had begun soliciting articles for Spring 2026 before *Alice* was suspended. Doc. 26-9 at ¶¶5-6. Caddell alleges the University's decision to close the magazine harmed her because she had been shadowing the editor-in-chief and planned to apply for that role for the 2026-27 school year. *Id.* at ¶7. Now she can no longer apply for editor-in-chief, receive the stipend associated with the job, or grow as a creator and artist. *Id.* at ¶¶8, 13, 20.

Similarly, Plaintiff Grant Sturdivant joined *Nineteen Fifty-Six* as a contributor in Fall 2024 and accepted a position as photography editor in Summer 2025. Doc. 26-8 at ¶¶5, 10-11. Sturdivant alleges that, due to the magazine's suspension, he can no longer "further the development of the skills that [he] gained from participating on the magazine's editorial board" or "publish [his] photography in an established, well-known publication." *Id.* at ¶18. Sturdivant planned either to apply for the editor-in-chief role or retain his position as photography editor for the 2026-27 academic year. *Id.* at ¶19.[3]

---

[3] Because at least one plaintiff has standing to seek reinstatement of *Alice* and at least one has standing to seek reinstatement of *Nineteen Fifty-Six*, the Court need not assess the standing of the other Plaintiffs. *See Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195-96 (11th Cir. 2009).

The evidence adduced by these plaintiffs is sufficient to establish legally cognizable injuries. Those injuries are traceable to the University's decision to close the magazines. And the injuries would be at least in part redressed by an order requiring the University to again start operating those magazines. Thus, the Court may proceed to the merits of Plaintiffs' motion.

### STANDARD

The Court may grant a preliminary injunction only if Plaintiffs demonstrate (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest. *Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011). Because "[f]ailure to show any of the four factors is fatal," A*CLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009), the Court will address only the first element—whether Plaintiffs have established a likelihood of success on the merits. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005) ("Controlling precedent is clear that injunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion.").

## DISCUSSION

The First Amendment of the Constitution, made applicable to States and public institutions like UA through the Fourteenth Amendment, prohibits making any "law … abridging the freedom of speech."

"Speech doctrine is famously complicated," *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024), and its "doctrines are manifold," *Bishop v. Aronov*, 926 F.2d 1066, 1070 (11th Cir. 1991); *see e.g.*, *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1053 (11th Cir. 2022) (Newsom, J., concurring) (listing "different variations of means-ends tests" that appear in "[f]ree-speech cases"). Indeed, there are at least three lenses through which to view the free-speech question in this case. But each reveals the same answer: The Free Speech Clause does not bar UA's decision to close its own magazines.

*First*, this result is seen most clearly through precedent addressing academic freedom and government speech. No one "claim[s] that the University is somehow required to offer a spectrum of courses to satisfy a viewpoint neutrality requirement." *Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217, 243 (2000) (Souter, J., concurring in judgment). Likewise, outside the classroom, "[t]he University need not provide junior years abroad in North Korea as well as France." *Id.* Decisions about what educational opportunities to offer belong to the University, and to the extent they constitute speech, it is University speech, not the speech of

12

students petitioning for a particular class or publication. In years past, UA decided that funding and publishing *Alice* and *Nineteen Fifty-Six* was a prudent use of limited resources; last semester, UA redirected those resources to a new magazine. The Free Speech Clause does not empower me to second-guess that judgment.

*Second*, viewing this case through "forum analysis" yields the same result. The Charter for UA's Media Planning Board designates "[s]tudent media at the University of Alabama" as "public forums for the free and responsible discussion of ideas and issues on campus." Doc. 31-2 at 9. In other words, each publication is a forum. The government has no obligation to maintain a forum it had no obligation to open in the first place. Because the Free Speech Clause did not require UA to open any magazines, it does not prohibit UA from closing them.

*Third*, even if Board affiliation, rather than each individual magazine, is the relevant forum, UA retains authority to regulate content and speaker access in a limited public forum, provided its regulations are reasonable and not a pretext for viewpoint discrimination. Here, the University has, at most, made selections based on content, not viewpoint. *Southern Historian* publishes historical content, not a historical viewpoint; *Black Warrior Review* publishes graduate literary content, not a graduate or literary viewpoint. And UA's decision to close *Alice* and *Nineteen Fifty-Six* because they focused on content by and for students of one sex or one race was a content-based decision, not one based on a female or black viewpoint.

Replacing those magazines with one open to content by and for all UA students is reasonable, and Plaintiffs have not shown that the change was pretext for silencing a particular viewpoint. To the contrary, the record reflects that viewpoints Plaintiffs might have expressed in *Alice* or *Nineteen Fifty-Six* have appeared in other UA publications and will remain eligible for publication in the new magazine.

Because Plaintiffs have not demonstrated a likelihood of success on the merits, their motion for a preliminary injunction is **DENIED**.

## I.     The University's Decisions Regarding Which of Its Magazines to Operate and Publish are University Speech.

"Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (opinion of Powell, J.). It thrives "not only on the independent and uninhibited exchange of ideas among teachers and students," but also, and "somewhat inconsistently, on autonomous decisionmaking by the academy itself." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985). Among the "essential freedoms of a university" is the right to determine "what may be taught" and "how it shall be taught." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in result). Accordingly, "[w]hen the University determines the content of the education it provides, it is the University speaking," and the University may "regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities

to convey its own message." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). That principle controls here and requires denying Plaintiffs' motion.

A University's authority to shape its curriculum is uninhibited by the Free Speech Clause. *See Edwards v. Cal. Univ. of Penn.*, 156 F.3d 488, 491-92 (3d Cir. 1998) (Alito, J.). That authority includes choosing which majors and courses to offer, *Walls v. Saunders*, 144 F.4th 995, 1003 (8th Cir. 2025), directing the content taught within them, *Bishop*, 926 F.2d at 1076-77, and imposing restrictions within clinical practicums, *Keeton*, 664 F.3d at 876-77. No one seriously contends otherwise. "Just as ordinary citizens cannot require the government to express a certain viewpoint or maintain a prior message, students cannot oblige the government to maintain a particular curriculum or offer certain materials in that curriculum based on the free speech clause." *Walls*, 144 F.4th at 1003.

The same logic extends to extracurricular programs, which are "essential parts of the educational process" and therefore subject to the same institutional discretion. *Christian Legal Soc. of Univ. of Cal. v. Martinez*, 561 U.S. 661, 686 (2010). A university may guarantee free-speech rights to students participating in certain extracurricular programs, just as some courses may be designed to promote and protect wide-ranging debate. But the First Amendment does not require a university to offer an art class or a school-sponsored publication indefinitely, though students

may express themselves in both. If a school is "not required to establish a newspaper," *Ala. Student Party v. Student Gov't Ass'n of Univ. of Ala.*, 867 F.2d 1344, 1347 (11th Cir. 1989), it is not forbidden from disestablishing it, *cf. Muir v. Ala. Educ. Tele. Comm'n*, 688 F.2d 1033, 1045 (5th Cir. 1982) ("The decision to cancel a scheduled program is no less editorial in nature than an initial decision to schedule the program.").

These principles are reinforced by government-speech doctrine. The Free Speech Clause "restricts government regulation of private speech; it does not regulate government speech." *Nussbaumer v. Sec'y, Fla. Dep't of Child. & Fams.*, 150 F.4th 1371, 1377 (11th Cir. 2025) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)) (emphasis deleted). Whether speech is government or private is therefore "dispositive of whether a Free Speech claim can progress." *Id.* That inquiry is "holistic" and "context-specific," not "'mechanical.'" *Id.* (quoting *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022)). Courts "generally consider three factors: 'the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression.'" *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1288 (11th Cir. 2024) (quoting *Shurtleff*, 596 U.S. at 252). Those factors, however, "are not

exhaustive and may not all be relevant in every case." *Id.* Here, the context-specific inquiry supports the University's discretion over which official publications to offer.

*First*, we look to the history of curricular decisions made by universities about which programs to offer students. Universities traditionally possess "a significant measure of authority over the type of officially recognized activities in which their students participate." *Martinez*, 561 U.S. at 686-87. That is because, as noted above, "extracurricular programs" are "essential parts of the educational process." *Id.* Student publications, like other extracurriculars, "may fairly be characterized as part of the school curriculum" when "they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). The magazines here fall comfortably within this history.

The evidence before the Court suggests that the University has always controlled which official student publications it will operate any given semester. The Charter makes clear that the University has final say over which publications will receive Board affiliation. *See* Doc. 31-2 at 16. And neither *Alice* nor *Nineteen Fifty-Six* obtained Board affiliation without University approval. *See, e.g.*, Doc. 26-2 ¶¶8-9. Thus, history supports the conclusion that UA is speaking when it decides which official student publications it will offer each semester.

*Second*, we consider "whether the public would likely associate the speech with the government or 'reasonably believe the government has endorsed the message.'" *Nussbaumer*, 150 F.4th at 1379 (quoting *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1076 (11th Cir. 2015)).

UA's endorsement of its official publications is clear. Each publication's "website, social media profiles, and trademark … are all owned by the University." Doc. 1 ¶40; *see also* Doc. 26-2 at ¶8. Paid staff of these publications are University employees. Doc. 31-2 at 4, ¶19. And the work of each enterprise is "supported and supervised as necessary and appropriate by the full-time professional staff" of UA. *Id.* at 9. Moreover, the VP for Student Life has the final say over which publications attain Board affiliation. Doc. 31 at 8. That decision is informed by whether the publication advances the University's goal of offering an attractive "slate of programs and learning experiences … to students." Doc. 31-1 at 3, ¶14.

These decisions necessarily communicate the University's values. For example, the University has chosen to operate *The Crimson White* while declining to operate expressly partisan or ideological newspapers. Doc. 31-2 at 12. That decision reflects the University's academic priorities. And if the University funded only one official magazine, and it was expressly "by and for" only white students, presumably the public would ask UA officials why the school had registered a trademark for the publication, staffed it, and published it. It would be a reasonable

question because these publications are "formally approved by and stamped with the imprimatur of" UA. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 218 (2015).

Plaintiffs themselves recognize the value of the University's imprimatur, not merely its funding. Plaintiff Tionna Taite, who submitted the proposal for *Nineteen Fifty-Six* to UA in 2020, explained that she "wanted the magazine to be housed within the Office of Student Media," and "to have MPB approval" in order to obtain UA resources including "a UA affiliated trademark." Doc. 26-2 at ¶8. She also understood that OSM association "would ensure financial security for the magazine" and "signal to the campus community" that the magazine "welcomed all students as editors, writers, contributors, and readers." *Id.* at ¶¶8-9. "[T]his positive association" with the public institution "is … why" she "participate[d] in the … program, instead of appealing to … students through 'purely private' media." *Mech*, 806 F.3d at 1076.

*Third*, UA's control over its official publications supports a government-speech conclusion. Here, "the government has circumscribed the message it is willing to send and [UA] holds discretion to reject nonconforming applicants." *Nussbaumer*, 150 F.4th at 1380. The government "need not control every word or aspect" of the speech at issue for the control factor to favor government speech. *Id.* (internal quotation marks omitted).

That control is pervasive here. The University decides which publications earn Board affiliation in the first place, and affiliation is the gateway to UA resources, UA facilities, UA trademarks, and UA funding. The VP for Student Life reviews and approves each affiliation decision. Once a publication is affiliated, the MPB appoints its student leader and retains ongoing authority to "oversee the effective and efficient management of the media under its purview." Doc. 31-2 at 9, 12. The rights and websites associated with each enterprise are University property. Paid staff are University employees. And the work of each enterprise is "supported and supervised as necessary and appropriate by … full-time professional staff" of UA. *Id.* at 9.

UA does grant editors substantial discretion over individual content decisions, and the Charter protects them from censorship or advance approval of specific articles. *Id.* But that editorial latitude operates within a framework the University controls. A landlord who permits a tenant to arrange the furniture does not thereby surrender ownership of the building. And the University sets the conditions— affiliation status, funding levels, staffing, and branding—within which student editors exercise their discretion.

The University's reservation of authority over those decisions is what matters here because Plaintiffs' claims do not turn on which articles will appear in an official UA magazine. They turn on which magazines UA will operate at all. That decision—

20

whether to affiliate with, fund, and brand a particular publication—rests entirely with the University. *Id.* at 15-16. It is a quintessential act of government speech: the government determining what message it is willing to associate its name with and what programs it is willing to sponsor. *See Nussbaumer*, 150 F.4th at 1376-77, 1380. UA's selection of which publications it affiliates with and operates is therefore government speech, and Plaintiffs cannot use the First Amendment to compel the University to maintain affiliation with publications it has chosen to discontinue. *See Chiras v. Miller*, 432 F.3d 606, 618 (5th Cir. 2005) ("[W]e conclude that the selection of curricular materials by the Board is clearly government speech."); *cf. Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest[.]").

It follows that an injunction requiring the University to reopen and operate these magazines would be tantamount to compelling it to continue offering a student's preferred major or class. Such an order would impermissibly intrude upon "the right of the University to make academic judgments as to how best to allocate scarce resources." *Widmar v. Vincent*, 454 U.S. 263, 276 (1981). Decisions of this kind will "by [their] nature … facilitate the expression of some viewpoints instead of others." *Ark. Educ. Tele. Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). But that is an inevitable feature of institutional choice.

21

Finally, the Court cannot view this issue in a vacuum but must consider it holistically. Plaintiffs' theory, taken to its logical end, would spawn constitutional litigation over any number of routine university programming decisions and thus "would risk implicating the courts in judgments that should be left to the exercise of [academic] discretion." *Id.* On such questions, the Court "cannot supplant [its] discretion for that of the University." *Bishop*, 926 F.2d at 1075.

## II.    The University May Close Limited Public Forums That It Has Created.

Plaintiffs' speech claim likewise fails under "forum analysis." Plaintiffs allege that the University violated their rights when the University stopped funding, supporting, and publishing the magazines. "Certainly, the school was not required to establish" those magazines. *Ala. Student Party*, 867 F.2d at 1347. But Plaintiffs argue that once the University created a forum for speech, the First Amendment constrained what it could do with that forum. That argument turns on "forum analysis, which considers 'when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.'" *McDonough v. Garcia*, 116 F.4th 1319, 1322 (11th Cir. 2024) (en banc) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985)). "The Supreme Court has recognized four types" of forums: "the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum." *Id.*

22

Limited public forums are at issue here. When the government creates a limited public forum, it may set it aside for "particular subjects" or "certain groups." *Keister v. Bell*, 29 F.4th 1239, 1252 (11th Cir. 2022). Thus, content-based restrictions on speech are constitutional, so long as they are "reasonable and viewpoint neutral." *Id.*

As a threshold matter, the relevant forum must be identified. Plaintiffs assert that the Board's Charter "established a public forum for student media enterprises," treating the Board itself as the forum. Doc. 26-1 at 23. But the Charter says that "[s]tudent *media*"—plural—"at the University of Alabama *are* designated as public *forums*"—again, plural—"for the free and responsible discussion of ideas and issues on campus." Doc. 31-2 at 9 (emphasis added). In other words, *each* student media enterprise is its own forum. This reading tracks the Sixth Circuit's decision in *Kincaid v. Gibson*, litigation over the release of a college yearbook, where the court saw "no real dispute" that "the forum in question [wa]s [the yearbook] itself." 236 F.3d 342, 348 (6th Cir. 2001) (en banc). The same is true here. The relevant forums are *Alice* and *Nineteen Fifty-Six*.

And because the Charter includes restrictions on these publications based "on subject matter and speaker identity," *Cornelius*, 473 U.S. at 806, *see* Doc. 31-2 at 12, each magazine is a limited public forum.

23

So framed, the question is straightforward: May the University close a limited public forum it created? It may. Even when a state creates a designated public forum, it "is not required to indefinitely retain the open character of" that forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). "[W]hen property has been designated for a particular expressive use, the government may choose to eliminate that designation." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 699 (1992) (Kennedy, J., concurring in the judgment). The Ninth Circuit has put it plainly: "The government creates limited public fora, and … it may close such limited fora 'whenever it chooses.'" *Koala v. Khosla*, 931 F.3d 887, 900 (9th Cir. 2019) (quoting *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 496 (9th Cir. 2015)).

Several Supreme Court decisions confirm this principle. In *Hazelwood School District v. Kuhlmeier*, the Court rejected a free-speech challenge by students whose work in the school newspaper had been censored. 484 U.S. 260, 276 (1988). Critically here, both the majority and dissent agreed that it was "[t]he State's prerogative to dissolve the student newspaper entirely." *Id.* at 276 n.9.

Similarly, in *Capitol Square Review & Advisory Board v. Pinette*, eight Justices agreed that the state could impose "a ban on all unattended displays" in a plaza it had previously opened as a public forum. 515 U.S. 753, 761 (1995); *id.* at

783 (Souter, J., concurring in part and concurring in the judgment); *id.* at 803 (Stevens, J., dissenting).

The Eleventh Circuit endorsed the same view in *Chabad-Lubavitch of Georgia v. Miller*, 5 F.3d 1383 (11th Cir. 1993) (en banc). There, "Chabad sought and obtained permission from the Georgia Building Authority and the Governor's office to erect and maintain a Chanukah menorah on the plaza in front of the State Capitol Building during the eight-day celebration of Chanukah." *Id.* at 1385 (footnotes omitted). The next year, Georgia rejected the request for fear of violating the Establishment Clause. *Id.* at 1385-86. Chabad sued, and the Eleventh Circuit sided with Chabad. *Id.* at 1395-96. Along the way, the court noted that "[i]f Georgia fears that it would violate the Establishment Clause by allowing the display, it can avoid the perception that it is endorsing a religion by," among other options, "closing the forum altogether." *Id.* at 1394. The court even described closing the forum as one way to "satisfy the Establishment Clause's requirements without foreclosing Chabad's speech." *Id.*

Thus, a government's decision to close a forum entirely will not be reversed based on the government's intent. *See DiLoreto v. Downey Unified Sch. Dist.*, 196 F.3d 958 (9th Cir. 1999); *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287 (7th Cir. 1996). In *DiLoreto*, a school district had opened its baseball field fence to private advertising, then closed the forum when a proposed religious

advertisement threatened Establishment Clause litigation. 196 F.3d at 962-63. The Ninth Circuit rejected the proposition "that the Constitution prohibited the school from closing the forum in response to appellant's ad" and held that the decision "to close the forum rather than post [the] advertisement and risk further disruption or litigation does not constitute viewpoint discrimination." *Id.* at 970.

In *Grossbaum*, while recognizing that motive is "relevant to a number of constitutional claims," 100 F.3d at 1292, the Seventh Circuit reached the same conclusion and explained why motive is beside the point when a forum is closed entirely: "Whatever the intent of the government actors, all viewpoints will be treated equally because the regulation makes no distinctions based on the communicative nature or impact of the speech." *Id.* at 1298. While concerns about motive might be relevant when the government replaces one content-based restriction on speech with another, *see, e.g.*, *Cornelius*, 473 U.S. at 812-13 (remanding to determine if new content-based restrictions were motivated by a desire to suppress viewpoints), where "the government enacts a content-neutral speech regulation for a nonpublic forum, there is no concern that the regulation is 'in reality a facade for viewpoint-based discrimination.'" *Grossbaum*, 100 F.3d at 1298 (quoting *Cornelius,* 473 U.S. at 811). Discrimination between viewpoints— that is, "treating like cases differently," *Lewis v. City of Union City, Ga.*, 918 F.3d

1213, 1222 (11th Cir. 2019) (emphasis deleted)—is impossible when a forum is closed to all viewpoints.

That principle is well supported. The Supreme Court has declined to strike down facially constitutional laws "on the basis of alleged illicit legislative motive." *United States v. O'Brien,* 391 U.S. 367, 383 (1968); *see, e.g.*, *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015). Even in the Equal Protection Clause context, the Court has explicitly declined to inquire into a government body's motives for closing a public facility where the closure was itself facially neutral. *Palmer v. Thompson,* 403 U.S. 217, 224-26 (1971). This caution safeguards the separation of powers by leading judges away from the temptation of ascribing bad motives to what they might view as bad policy.

Courts have also recognized practical problems with motive inquiries, including that "[g]overnment actions may be taken for a multiplicity of reasons, and any number of people may be involved in authorizing the action." *Grossbaum*, 100 F.3d at 1293. This is not a new concern. Chief Justice Marshall, for example, "doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements, operating on members of the supreme sovereign power of a state, to the formation of a contract by that power, are examinable in a court of justice." *Fletcher v. Peck*, 10 U.S. 87, 130 (1810). And in *O'Brien*, the Court "decline[d] to void" a ban on destroying draft cards based on a purported unlawful

purpose where the law "could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it." 391 U.S. at 384. Hence the "wise and ancient doctrine that a court will not inquire into the motives of a legislative body or assume them to be wrongful." *Chacon v. Granata*, 515 F.2d 922, 926 n.5 (5th Cir. 1975) (quoting *United States v. Constantine*, 296 U.S. 287, 299 (1935) (Cardozo, J., dissenting)).

Turning back to this case, *Alice* and *Nineteen Fifty-Six* were forums UA opened and later closed. Closed forums are "no longer protected as … public forum[s]," *Sons of Confederate Veterans, Va. Div. v. City of Lexington, Va.*, 722 F.3d 224, 230-31 (4th Cir. 2013), and Plaintiffs' claim thus fails. Like the governments in *DiLoreto* and *Chabad*, UA's concern that maintaining these forums could expose it to federal litigation contributed to its decision to close them. Its reasonable decision to "avoid" litigation risk by "closing the forum[s] altogether," *Chabad-Lubavitch*, 5 F.3d at 1394, does not constitute viewpoint discrimination.

A contrary holding would produce "less speech, not more." *Forbes*, 523 U.S. at 680. If designating a forum carries with it the risk that it cannot be closed without expensive and invasive litigation, especially where maintaining the forum creates its own legal exposure, the government "might not open the property at all." *Id.* Governments are entitled to "breathing space when faced with the cost of disruption and/or ensuing litigation over whether to continue with the limited public forum that

[they] create[].” *Gay Guardian Newspaper v. Ohoopee Reg'l Libr. Sys.*, 235 F. Supp. 2d 1362, 1377 (S.D. Ga. 2002), *aff'd*, 90 F. App'x 386 (11th Cir. 2003). That breathing space leaves UA free to create and maintain forums for student speech without fear that doing so will empower courts to “substitut[e] their own notions of sound educational policy for those of the school authorities which they review.” *Martinez*, 561 U.S. at 686.

### III.    Assessing Board Sponsorship of Student Media as the Relevant Forum Yields the Same Result Because UA's Actions Were Reasonable and Not Viewpoint Discriminatory.

Plaintiffs assert that the relevant forum is the Board, rather than each Board-affiliated media enterprise, contending “that Defendants established a public forum for student media enterprises at the University by creating the OSM and MPB and distributing UA Student Media Funds, thereby ‘opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects.’” Doc. 26-1 at 23 (quoting *McDonough*, 116 F.4th at 1328). But even if Board affiliation is the relevant forum, the result remains the same. The University has authority to make funding decisions “based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral,” *Cornelius*, 473 U.S. at 806, and the University has complied with those restrictions.

29

The key point of contention between the parties is whether the University's decision to close *Alice* and *Nineteen Fifty-Six* constituted viewpoint discrimination. Plaintiffs present their case as "nearly identical" to *Rosenberger v. Rector & Visitors of the University of Virginia*, Doc. 26-1 at 5, but that comparison does not hold.

*Rosenberger* was a case about a University of Virginia policy that allowed nearly any UVA student group to apply for funds "to support a broad range of extracurricular student activities that 'are related to the educational purpose of the University.'" *Rosenberger*, 515 U.S. 819, 824 (1995). Despite funding 118 different groups, including 15 media groups, UVA would not fund *Wide Awake* magazine because its first issue revealed that the publication "primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality." *Id.* at 825. The Supreme Court held that this was impermissible viewpoint discrimination: UVA had "open[ed] a forum for speech and to support various student enterprises," *id.* at 840; "taken pains to disassociate itself from the private speech involved," *id.* at 841; and then withheld funding specifically because of the religious perspective from which the magazine addressed its topics: "The prohibited perspective, not the general subject matter, resulted in the refusal to" fund the student group, *id.* at 831.

This case differs from *Rosenberger* in at least two fundamental respects.

*First*, the scope of the forum. In *Rosenberger*, nearly any subject matter was open for discussion by any student group. Here, UA's forum is far narrower.

Plaintiffs argue as if the Board has opened its doors to all comers and all content except *Alice* and *Nineteen Fifty-Six*, but it is uncontested that OSM "does not provide funding and resources to all student publications as a matter of course." Doc. 31-2 at 3, ¶10. Affiliation requires approval through a multi-stage process that culminates in review by the VP for Student Life, who reports to UA's President. Doc. 31-1 at 3, ¶13; Doc. 31-2 at 9, 15-16. The Board weighs proposed publications against criteria including campus need, financial impact, overlap with existing enterprises, and long-term viability. Doc. 31-2 at 15. And the Charter expressly bars the Board from affiliating with "any student media enterprise with an espoused ideological, sectarian, religious, or partisan political editorial policy." *Id.* at 12. The University has therefore decided, for example, that a general newspaper like *The Crimson White* that is open to various partisan views is a valuable "part of a slate of programs and learning opportunities," Doc. 31-1 at 3, ¶14, while declining to sponsor expressly partisan newspapers. Thus, the breadth of the forum that made UVA's exclusion in *Rosenberger* suspect is simply absent here.

*Second*, and more fundamentally, what UA did is, at most, content discrimination, not viewpoint discrimination. Within the bounds of a limited public forum, determining whether the government has "act[ed] to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate" requires distinguishing "between, on the one hand, content discrimination, which

31

may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger*, 515 U.S. at 829-30. The Court has acknowledged that this "distinction is not a precise one." *Id.* at 831. Viewpoint discrimination occurs "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829.

Plaintiffs have not defined a discernible viewpoint that UA suppressed. Plaintiffs begin by claiming that the "magazines' race and sex-specific viewpoints were evident." Doc. 26-1 at 24 (cleaned up). But what are these evident "race and sex-specific viewpoints"? Asked at oral argument to articulate the viewpoint of *Alice* or *Nineteen Fifty-Six*, Plaintiffs could offer nothing more than a restatement of each magazine's subject matter: *Alice* reflects the "editorial perspectives of students seeking to highlight and amplify the views and experiences of women," *id.*, and *Nineteen Fifty-Six* reflects "the editorial perspectives of students interested in the views and experiences of Black people, Black culture, race, and an array of other related topics," *id.*

Those terms better describe the magazines' content rather than any viewpoint. A magazine about sports reflects "the editorial perspectives of students interested in athletics." A magazine about history reflects "the editorial perspectives of students

interested in the past." A decision to exclude either of them from Board affiliation would be a decision based "on specific topics," *McDonough*, 116 F.4th at 1328, not a decision to discriminate against a "sports viewpoint" or "historical viewpoint." The Supreme Court has recognized as much, holding that "restrictions that exclude political advocates and forms of political advocacy" from a limited public forum are "content-based restrictions on speech," not restrictions based on political viewpoints. *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12 (2018).

The contrast with *Rosenberger* is instructive. There, *Wide Awake* had a definable driving premise: "to challenge Christians to live, in word and deed, according to the faith they proclaim and to encourage students to consider what a personal relationship with Jesus Christ means." *Rosenberger*, 515 U.S. at 826. That Christian worldview shaped every editorial choice the publication made. Plaintiffs claim that, "[l]ike the publication at issue in *Rosenberger*, both *Alice* and *Nineteen Fifty-Six* were established to publish the views of contributors and editors aligned with the magazines' respective missions." Doc. 33 at 3-4. But the critical distinction is that the editorial discretion in *Rosenberger* could not be separated from its viewpoint, thus resulting in a "religious editorial viewpoint." 515. U.S. at 827. An actual "premise, [] perspective, [or] standpoint" drove the editorial discretion, *id.* at 831; the driving mission behind the editorial function was *definable*—as a "Christian viewpoint," *id.* at 826. The Court arguably recognized that religion "is *both* (and

33

simultaneously) a general, content-based category *and* a more particular viewpoint."

*Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1355 (11th Cir. 2024) (Newsom, J., concurring).

But because race and sex do not work the same way, the comparison with *Rosenberger* breaks down. The Court has rejected as "offensive and demeaning" the "assumption that students of a particular race, because of their race, think alike," *SFFA v. Harvard*, 600 U.S. 181, 220-21 (2023) (cleaned up), and Plaintiffs don't argue that there is a unified women's or black viewpoint. Thus, there is no viewpoint inseparable from the editorial activity within the magazines at issue here, just students interested in publishing content by and for women or black students, whatever their viewpoint. And without a viewpoint, there can be no viewpoint discrimination.

Plaintiffs invoke the principle that "the editorial function itself is an aspect of 'speech[.]'" Doc. 33 at 5 (quoting *Denver Area Educ. Telecomms. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 737 (1996)). But that proposition does not transform content discrimination into viewpoint discrimination whenever content is bundled with more content. The question is not whether editorial discretion constitutes speech—it does—but whether the University's decision targeted the *perspective* from which that discretion was exercised or merely the *subject matter* around which it was organized. UA's restriction on magazines with an expressly political or identity-

34

based focus remains a content-based restriction, *Mansky*, 585 U.S. at 12, even if the excluded magazines sought "to publish the views of contributors and editors aligned with the magazines' respective missions," Doc. 33 at 3-4. The editorial function is protected, but the subject matter around which it is organized is not immune from reasonable content-based limitations within a limited public forum.

Plaintiffs' theory, taken seriously, would collapse the distinction between content and viewpoint entirely. Under their approach, combining *Marr's Field Journal* and *Black Warrior Review*, the Board's two literary journals, one for undergraduates and the other for graduate students,[4] would likely discriminate against an "undergraduate viewpoint" or a "graduate viewpoint." Suspending a sports magazine would likely discriminate against a "sports viewpoint." These propositions are untenable. *Sports Illustrated* is a magazine about sports, not a magazine with a sports-is-important viewpoint. *Marr's Field Journal* is a journal defined by its content—literary works by undergraduates—not by an undergraduate or literary viewpoint. *Nineteen Fifty-Six* is a magazine defined by its content—articles and photography focused on black students—not by a black viewpoint. Accepting Plaintiffs' framing would render the content/viewpoint distinction

---

[4]   *Media Opportunities*, STUDENT MEDIA, UNIVERSITY OF ALABAMA, https://studentmedia.sl.ua.edu/media-opportunities/ (last visited May 13, 2026)

35

meaningless and subject every editorial programming decision to potential constitutional litigation.

Accordingly, the evidence before the Court establishes that UA's decision did not "discriminate against speech on the basis of viewpoint" and was "reasonable in light of the purpose served by the forum." *McDonough*, 116 F.4th at 1329. Viewpoint discrimination occurs "when speech is restricted because of the speaker's viewpoint on the topic—i.e., but for the perspective of the speaker, the speech would normally be permissible." *Hartman v. Thompson*, 931 F.3d 471, 479 (6th Cir. 2019). The magazines were not closed because of the perspective of the editorial boards. They were closed because of the limiting, exclusive nature of the "topic[s] discussed" and "the substance of the message more generally." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1241 (11th Cir. 2019). That kind of content-based distinction is permissible within a limited public forum. *See Martinez*, 561 U.S. at 681. The University determined that its educational mission was better served by a magazine that was not "by and for" students of only one race or sex and was instead welcoming to a broader range of content and contributors. Doc. 31-2 at 7, ¶34. That decision was entirely reasonable.

Nor is there evidence that the decision was "a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. The closure imposes no restriction on any viewpoint that can be expressed within the Board's remaining publications.

36

Content Plaintiffs might have published in *Alice* or *Nineteen Fifty-Six* has already appeared in *The Crimson White*. Doc. 31-1 at 8-9, ¶¶42-48. And "[a]ny content that could have been published in future editions of *Alice* and *Nineteen Fifty-Six* will be eligible for publication in the new magazine, subject to the discretion of the future magazine's student editor-in-chief," who "was a paid staff member of one of the suspended MPB magazines." Doc. 31-2 at 6, ¶¶32-33. Thus, Plaintiffs' viewpoints have not been excluded from University-sponsored media. UA has simply redirected resources from two narrowly focused magazines to one open to all students—a decision that expands the range of voices the University's publications will carry.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for a Preliminary Injunction (Doc. 26) is **DENIED**.

**DONE** and **ORDERED** this 22nd day of May, 2026.

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

37